### KILMER v. HUTTON et al.

(Supreme Court, Appellate Division, First Department. April 8, 1909.)

1. TROVER AND CONVERSION (§ 40*)—CORPORATE STOCK—NEGLIGENCE—EVIDENCE —SUFFICIENCY.

    Evidence, in an action for converting stock delivered to defendants' employé for transfer, *held* to show that plaintiff was not negligent.

    [Ed. Note.—For other cases, see Trover and Conversion; Dec. Dig. § 40.*]

2. PRINCIPAL AND AGENT (§ 123*)—AUTHORITY—PROOF.

    Stockbrokers, having vested apparent authority in an employé to deal with customers, cannot relieve themselves from liability for his acts by testimony tending to show lack of such authority.

    [Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 420; Dec. Dig. § 123.*]

3. ESTOPPEL (§ 75*)—EQUITABLE ESTOPPEL—OWNERSHIP OF STOCK.

    Plaintiff, by delivering to brokers' employé certificates of stock purchased through them by plaintiff's deceased husband, and indorsed to her and her daughter, for transfer on the corporations' books, did not vest the employé with indicia of ownership so as to estop plaintiff to sue the brokers for conversion of the stock in transactions with the employé, who dealt with the stock as his own.

    [Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 189, 193; Dec. Dig. § 75.*]

4. TROVER AND CONVERSION (§ 10*) — DISPOSITION OF PROPERTY — CORPORATE STOCK.

    Under the rule that, if one rightfully possessed of chattels with the owner's permission makes an unauthorized use of them, there is a conversion, a brokers' employé who became lawfully possessed of certificates of stock to be transferred on the corporate books converted them, if he delivered them to the brokers as his own property.

    [Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. §§ 84, 86; Dec. Dig. § 10.*]

5. BROKERS (§ 38*)—PRIMA FACIE CONVERSION—CORPORATE STOCK.

    Corporate stock was prima facie converted by brokers, where one to whom the certificates were indorsed delivered them to the brokers' employé for transfer to the indorsee on the corporate books, and in transac-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tions between the employé and the brokers he dealt with the stock as his own, resulting in a procurement of a transfer to the brokers.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 38.*]

6. TROVER AND CONVERSION (§ 1*)—"CONSTRUCTIVE CONVERSION."

A "constructive conversion" takes place when one so acts respecting another's goods as to amount in law to appropriation of the property.

[Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 2, p. 1469.]

7. TROVER AND CONVERSION (§ 1*)—WHAT CONSTITUTES CONVERSION.

Every unauthorized taking of personalty or intermeddling with it, with intent to so apply and dispose of it as to alter its condition or interfere with the owner's dominion, is a conversion.

[Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. § 1; Dec. Dig. § 1.*]

8. TROVER AND CONVERSION (§ 25*)—PERSONS LIABLE.

When property is converted by one and is afterwards delivered to another, trover lies against both.

[Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. § 173; Dec. Dig. § 25.*]

9. BROKERS (§ 38*)—CONVERSION OF CORPORATE STOCK—ACT OF THIRD PERSONS —BONA FIDES—EVIDENCE.

In an action against brokers for converting certificates of stock delivered by plaintiff to their clerk for transfer to plaintiff on the corporate books, and used by the clerk in transactions with the brokers as his own property, held not sufficient to show their good faith in dealing with the clerk relying on his ownership.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 38.*]

10. NOTICE (§ 6*)—IMPLIED NOTICE.

One having sufficient information to put a prudent man on inquiry and neglecting to make inquiry is presumed to have actual notice.

[Ed. Note.—For other cases, see Notice, Cent. Dig. §§ 4, 6; Dec. Dig. § 6.*]

11. TRIAL (§ 253*)—INSTRUCTIONS—IGNORING THEORIES.

In an action against brokers for converting certificates of stock delivered to their clerk for transfer to plaintiff, an instruction that if the clerk took the stocks to the brokers as his brother's property, and the brokers, believing him and without knowing of his transaction with plaintiff, received the stocks and credited them to the brother, etc., plaintiff could not recover, was erroneous as ignoring constructive notice to the brokers of the conversion by the clerk.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 613, 620; Dec. Dig. § 253.*]

Appeal from Trial Term, New York County.

Action by Harriet N. Kilmer, Charles E. Kilmer's administratrix, against Edward F. Hutton and others. From a judgment for defendants and an order refusing a new trial, plaintiff appeals. Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and HOUGHTON, JJ.

Black & Peck (Frank S. Black, of counsel), for appellant.
William F. S. Hart (David Tim, of counsel), for respondents.

CLARKE, J.   The defendants are stockbrokers, and the plaintiff is the widow and administratrix of Charles E. Kilmer, deceased. Mr. Kilmer died on March 23, 1906, intestate, and leaving a widow and one daughter, Catherine E. Swinnerton, his sole heir and next of kin. Mrs. Kilmer, having taken out letters of administration, obtained from a safe-deposit box a certificate, No. 125,003, dated February 26, 1906, for 100 shares of the stock of the New York Central & Hudson River Railroad Company, in the name of Charles E. Kilmer. The customary assignment upon the back thereof was in blank, but signed "C. E. Kilmer, in presence of A. Foshay," dated February 26, 1906. Also certificate C414, dated November 8, 1905, for 100 shares of first preferred stock of the United States Rubber Company, issued to Charles E. Kilmer. The assignment was in blank, signed "C. E. Kilmer, in presence of A. Foshay," and dated February 26, 1906. Also five certificates for 100 shares each of Columbus & Hocking Coal & Iron Company. These certificates were made out in the names of various persons, and the assignments in blank thereon bore the signatures of such persons.

In the first part of April, 1906, Miss Foshay, who had been the stenographer of Mr. Kilmer, at Mrs. Kilmer's request wrote in the names Harriet N. Kilmer and Catherine E. Swinnerton in the blank left for the name of the assignee on the assignment indorsed on the New York Central certificate. Mrs. Swinnerton was Mrs. Kilmer's daughter. Thereupon Mr. Swinnerton, her son-in-law, presented this certificate at the office of the company for the purpose of having it transferred in accordance with the assignment. The transfer agent declined to do it, because on the face of the certificate appeared the name Charles E. Kilmer, and the signature to the assignment was C. E. Kilmer, stating that some person must be procured to guarantee that the signature of C. E. Kilmer was written by Charles E. Kilmer, the holder of record.

Mrs. Kilmer had found among her husband's papers a letter with the heading:

"E. F. Hutton & Co., Bankers, 33 and 35 New Street; Members N. Y. Stock Exchange, etc., January 9th, 1906. My Dear Mr. Kilmer: Just a line to let you know where I am. I am here from ten to three. Yours truly, C. A. Bliven"

—indorsed, "Jan. 11, 1906, K." Also a letter addressed to Mr. Kilmer with the same heading of E. F. Hutton & Co., January 18, 1906, addressed to Mr. Kilmer:

"As per your instructions, we have bought for your 500 shares of Hocking Coal & Iron as follows:

200 shares at 20⅜.
300  "    "  20½.

Kindly send check for $3,000 as margin by messenger today. Yours very truly, C. A. Bliven."

Also a copy of a letter written by Miss Foshay, at Mr. Kilmer's dictation, the original of which was mailed by her, dated January 18, 1906:

"Messrs. E. F. Hutton & Co., 33 New Street, Manhattan. Your favor of today notifying me that you have bought 500 shares for my account of Columbus & Hocking Coal & Iron Company at hand. Enclosed herewith please find check for the sum of $3,000 as margin for my account."

A canceled check drawn by Mr. Kilmer on the Morton Trust Company, dated January 18, 1906, to the order of E. F. Hutton & Co., for $3,000, indorsed by them and stamped "Paid." A memorandum statement under the heading of E. F. Hutton & Co., bankers, and dated January 22, 1906:

"Mr. C. E. Kilmer: We have this day Bot your account with the following:

| | | | |
|---|---|---|---|
| Jan. 19. | Bt. | 200 H. C. I. 20–⅜....................$4,100 | |
| | | 300 H. C. I. 20–½..................:.$6,187 50 | |
| | | | $10,287 50 |
| Jan. 22. | Int. 6%...................................... | | 3 15 |
| | | | $10,290 65 |
| " | 18. | Cr. Check...................................$3,000 00 | |
| " | 22. | 500 H. C. I. Del'd.......................... 7,290 65 | |
| | | | $10,290 65" |

In pencil: "Paid $7290.65. Jan. 22, 06, E. F. Hutton & Co., C. A. Bliven." Also a canceled check drawn by Mr. Kilmer on the Morton Trust Company on January 26th, to the order of E. F. Hutton & Co., for $7,290.65, indorsed by E. F. Hutton & Co., and stamped "Paid." She also found Mr. Bliven's name in a notebook of her husband, and Miss Foshay had known Bliven as a business acquaintance of Mr. Kilmer who had come to the office occasionally while Mr. Kilmer was alive.

At Mrs. Kilmer's request, Mr. Swinnerton went to the defendants' office, where he found Mr. Bliven sitting at a desk, and requested him to call on Mrs. Kilmer at her late husband's office on Park Row. Bliven called at the office about the middle of April, and Miss Foshay introduced him to Mrs. Kilmer, who asked him if he was a member of the firm of E. F. Hutton & Co. He said he was not a member but was connected with the firm, and that he knew Mr. Ellis very well. She spoke to him about these shares of stocks and asked him about the transfer. He said that he did not know about it, but that his firm, E. F. Hutton & Co., undoubtedly did know, and he would find out and let her know. Within a day or two he called again and told Mrs. Kilmer that E. F. Hutton & Co. could have these stocks transferred, and would have it done for her. On the 19th of April he called again, and Mrs. Kilmer told him that she would like to have E. F. Hutton & Co. transfer 50 shares of New York Central to herself, 50 shares to Mrs. Swinnerton, 100 shares U. S. Rubber, first preferred, to herself, and delivered to Bliven for that purpose the two certificates. Bliven drew two receipts on paper bearing Charles E. Kilmer's letter head, and reading:

"April 19, 1906. Received from Harriet N. Kilmer 100 shares of U. S. Rubber stock, first pfd. No. C414. E. F. Hutton & Co., C. A. Bliven."

And the other, same date:

"Received from Harriet N. Kilmer and Catherine E. Swinnerton, 100 shares of New York Central stock, No. 125,003. E. F. Hutton & Co., C. A. Bliven."

He said:

"This is only my personal receipt, my firm will send you a receipt for all the stocks."

On the 25th of April, Mrs. Kilmer delivered to Bliven the 5 certificates of Columbus & Hocking Coal & Iron stock of 100 shares each, telling him that she would leave that stock with E. F. Hutton & Co. to be sold at $30 per share, and Bliven gave her a receipt similar to the two signed on the 19th. Subsequently there was received by mail a receipt upon the stationery of the defendants with the date April 19, 1906, for the Central, the Rubber, and the Columbus & Hocking Coal & Iron stock, signed with a rubber stamp, "E. F. Hutton & Co.," and the initials "J. C. W."

From this point I state the facts from the defendants' point of view. That Bliven had been known to the members of the firm for some years; that he had had with them a speculative account; that they offered him a position at $50 a week; that he was employed from the 1st of April, 1906, to July 6, 1906, in the customers' room as a clerk to meet the customers as they came in from out of town offices, to furnish information to the customers in the office regarding earnings of railroads and other gossip that came out through the news ticker, and answer telephones and acquaint customers of the condition of the market over the telephone, and generally the duties of an outside man in an office in Wall street; that Bliven was told that the firm could not permit any employé to have any speculative or trading account in the office, and that thereupon he transferred his account to his brother, H. C. Bliven, Jr., and got a letter from him accepting the account, and also a letter giving C. A. Bliven power of attorney to act for the account and manage it. On the 19th of April Bliven presented the New York Central certificate with the assignment transferring it to Harriet N. Kilmer and Catherine E. Swinnerton, signed "C. E. Kilmer," and the Rubber certificate with the assignment in blank, signed "C. E. Kilmer," to the cashier of the defendants, and asked that they be credited to the account of H. C. Bliven, Jr., and they were so credited on April 20, 1906. The cashier called the attention of the firm to the fact that they were not properly indorsed. This member of the firm testified that he asked Bliven to take the certificates to Mr. Kilmer and have him sign his full signature as it appeared on the face of the certificates; that Bliven said that Mr. Kilmer had died a few days before, but that Mrs. Kilmer was familiar with the transaction, and that he would take them to her and she would do anything in her power to make them transferable and negotiable; that after he was told that Mr. Kilmer was dead he asked him how he, Bliven, got those certificates, and Bliven said that they were accepted as payment of a debt which Mr. Kilmer had with his brother and himself, and that he had received them some weeks or months before; that Mrs. Kilmer was familiar with the matter, was aware of this obligation having existed, and that she would be glad to do anything in her power, she being the administratrix, to put these certificates in negotiable form.

On the 26th of April, the 500 shares of Columbus & Hocking Coal & Iron stock were brought in by Bliven and credited to his brother's ac-

count. As these certificates were in negotiable form, according to the customs of the Street, the defendants testified that they commenced to allow the Bliven account to trade on Hocking Coal & Iron stock on the day they were received.

On the 11th of May, the defendants delivered the New York Central and the Rubber certificates to Bliven, and he took them back to Mrs. Kilmer. She signed each of the assignments, "Harriet N. Kilmer, administratrix for the affairs of Charles E. Kilmer," and acknowledged the same before a notary public; and on the 12th of May they were again credited to the Bliven account with the defendants. So far as the Rubber certificate was concerned, the assignment up to that time having been in blank, an employé of the defendants wrote in as the assignee, "E. F. Hutton & Co., 35 New Street, N. Y. City," before Mrs. Kilmer signed and the defendants wrote under the acknowledgment:

"We guarantee the endorsement on this certificate, C. E. Kilmer, to be made by the same person represented on the face of this certificate, Charles E. Kilmer. [Signed] E. F. Hutton & Co."

And on May 16th said certificate was surrendered to the Rubber Company for cancellation, and a new certificate, No. C2251, was on that day duly issued in lieu thereof to E. F. Hutton & Co. The Central certificate was presented by the defendants to the transfer agent, but the company would not issue a new certificate. The defendants' cashier told Bliven that it would be necessary for him to get the surrogate's certificate showing that Mrs. Kilmer had been appointed administratrix, and also a letter from him stating that he knew Harriet N. Kilmer and Catherine E. Swinnerton to be the beneficiaries of the will of Charles E. Kilmer, and that they were the only beneficiaries. Bliven thereupon went to Troy, where Mrs. Kilmer then was. He carried with him a typewritten paper which the defendants' cashier had given to him on the regular stationery of the defendants, with their name and address thereon, addressed to the treasurer of the New York Central Railroad Company, and reading:

"Dear Sir: This is to certify that I, as surrogate of Rennselaer County, have issued to Harriet N. Kilmer letters of administration of the affairs of Charles E. Kilmer, deceased; and it is known to me that Harriet N. Kilmer is a beneficiary in the estate of Charles E. Kilmer."

With this paper Bliven and Mrs. Kilmer went to the surrogate's office and obtained the surrogate's signature thereto. The original certificate, 125,003, with the assignment to Mrs. Kilmer and Mrs. Swinnerton on the back, was again presented to the transfer agent, with this letter prepared by the defendants and signed by the surrogate, and thereupon, on the 16th day of June, the company issued its certificate, 127,188, to Mrs. Kilmer and Mrs. Swinnerton, and this certificate was by the defendants on the 18th of June credited to the Bliven account. The testimony shows that items were credited in the accounts the day after their receipt.

On the 22d of June, this certificate was again delivered to Bliven, the defendants having inserted in the blank assignment on the back thereof the firm name, E. F. Hutton & Co., who took it to Troy and

on the 23d of June procured the signatures and acknowledgments of both ladies, Bliven stating that E. F. Hutton & Co. wanted the indorsement of Mrs. Kilmer and of her daughter on the back of this certificate. On the 25th the Central Company issued a new certificate therefor, 127,289, in the name of E. F. Hutton & Co., and on the same day it was again credited in the Bliven account.

The defendants collected the dividends and rights on these various stocks while in their possession, and credited them to the Bliven account. On or about July 6, 1906, the defendants, at the instance of Bliven, transferred this account to Waterman, Anthony & Co., brokers, who ultimately sold the stock on the order of the Blivens. The aggregate value of the stocks in Bliven's account at the market price at the time it was transferred was $61,540. The debit in the account was $49,108.51, which sum Waterman, Anthony & Co. paid to the defendants at the time of the transfer. The defendants testified that they received and dealt with the stocks as they did, relying absolutely upon nothing else but the statement of C. A. Bliven that they were his property, but none of these stocks were ever assigned or transferred to Bliven.

There was at no time any written indicia of ownership in him proceeding from the plaintiff or her daughter. Defendants never had an order from the plaintiff or Mrs. Swinnerton to transfer the stock. The defendants knew that the stock came from a dead man's estate. All they purported to have proceeded upon was the statement that Bliven had received the stock from the dead man in payment of an antecedent debt. They made no other inquiry. They accepted Bliven's word. He produced no written evidence. The Central stock bore, over the name of the dead man, an assignment to his wife and daughter. Three several times this certificate of stock went through their office, and it was brought home to them over and over again that they were dealing with the property of an estate and in regard to which an administrator had to act. Notwithstanding the repeated refusals of the railroad company to issue a new certificate and the care it was taking in the premises, the defendants made no inquiries whatever as to the truth of Bliven's story, an extraordinary story in view of the physical condition of the Central stock, but credited the speculative account, which they knew was his, although they had required it to be put in the name of his brother to technically avoid the rule against carrying an account of an employé, with some $33,000 worth of securities, when that employé was, as they claim, merely an outside office man to give information to customers at $50 a week, without other authority than his bare statement.

The plaintiff's story is that, some little time after she had delivered the stock to Bliven to take to the defendants for the purpose of having them have it properly transferred, as directed by her, to herself and daughter, Bliven said that the defendants would, in addition to the dividends which they would collect for her, pay her 2 per cent. if she would allow these stocks to remain in their office, and that after several interviews she consented to this, and, as she was going away to be gone until October, she agreed to leave the Rubber and Central stock with the defendants until the fall, while the Columbus, H. C. &

I. stock was to be left for sale when it should reach 30; and that, carrying out this agreement, she had transferred the stock into the name of the defendants, because Bliven had told her that the defendants had said that if the firm used these certificates it would be necessary to have them in their name; that stock in a woman's name was not good delivery, and could not be used as collateral. Bliven testified that he did make this agreement with the plaintiff, and that he was authorized to do it by the defendants. The defendants emphatically deny any such conversation, or any dealings or knowledge of any dealings with Mrs. Kilmer.

If it be conceded that Bliven deceived Mrs. Kilmer and deceived the defendants, that, having obtained the stock from the plaintiff for the specific purpose of having it transferred as directed by her, he diverted it to his own use and deceived the defendants into believing that it was his stock and that they dealt with it under such belief, is there any liability to the plaintiff by the defendants?

It seems to me that Mrs. Kilmer, so far as she was concerned, was dealing with the defendants through their employé, and was not chargeable with negligence in so doing. She found that he had been the representative of the defendants, a very short time before these transactions began, in the purchase of $10,000 worth of stock by the defendants for her husband; that he had made delivery of the stock, had received payment therefor from her husband, and had given a receipt therefor to her husband in the name of the defendants. When she sent for him he was found at his desk in the defendants' office, and it is conceded that he was actually employed and under salary there. She had receipts and letter heads and envelopes bearing the business title of the defendants, and she intrusted her stock to him as the employé of the defendants in the first instance, for the sole and simple purpose of having it transferred to herself and daughter in accordance with her instructions. And in the several instances where she was called upon to sign her name thereafter she found upon the stock, put there by the defendants, the name of E. F. Hutton & Co., in exact accordance with the representations which had been made to her. Under those circumstances, it seems to me that there was nothing to put her on her guard; that she had every reason to believe that she was dealing with the duly accredited representative of the defendants, and that they, by their employment of him, not only in the present case but in the previous transaction with her husband, of which the proofs were of record in her hands, had vested him with that apparent authority, which is not to be destroyed by their testimony as to the limitations of his duties which they say existed.

The defendants appeal to that line of cases which hold that while certificates of stock are not in the eyes of the law negotiable instruments, yet that under some circumstances they possess some of the qualities of negotiable instruments, and that if an owner puts a certificate of stock into the possession of another with the written indicia of ownership, so that that stock becomes transferable, if the agent, violating his duty, diverts that stock for his own purposes, the owner may not recover over against the transferree in good faith and for value. So far as the New York Central stock was concerned, the

plaintiff never did give to Bliven the written indicia of ownership in him. When he received it, it did not even bear her signature to the assignment, but the assignment signed by her late husband was to herself and her daughter, and yet the defendants put this stock in this condition to the credit of the Bliven account. And the second time they dealt with it, when it did have the name of Mrs. Kilmer as administratrix attached to the assignment, it was still made to herself and her daughter. And the third time, when they sent it to Troy with a letter drafted by them, upon their paper, to procure the surrogate's signature to a letter to be deposited with the railroad company, it was still assignable to herself and daughter; and when, in accordance with that assignment, the company issued the new certificate, it was to Mrs. Kilmer and her daughter; and, when Mrs. Kilmer and her daughter signed the assignment of that certificate, they did it, not to Bliven, but to the defendants, who had caused their name to be written in the assignment before presenting it to her for her signature, and they immediately caused a new certificate to be taken out in their own name. Now all this time, and from the beginning to the end of the account, they had credited this stock to the account of Bliven, without the stroke of a pen in any shape, manner, or form conferring any written indicia of ownership on Bliven; and it seems to me that the line of cases to which I have referred, under those circumstances, does not apply, but that this case comes fairly within Hall v. Wagner, 111 App. Div. 70, 97 N. Y. Supp. 570, where this court said:

"To establish this estoppel, it must appear that the true owner had conferred upon the person who had diverted the security the indicia of ownership, or an apparent title or authority to transfer the title. The reasoning in all these cases negatives the extension of a principle to a case where a stock certificate, such as the one in question, has been stolen or fraudulently obtained from the true owner; for there the owner of the stock by no voluntary act conferred upon the third party the indicia of ownership, apparent title or right to transfer the stock; and so I assume that if the owner of the certificate of stock, with a valid transfer, executed by the person in whose name the stock stood, should give it to a messenger to be carried to a bank for safe-keeping, and that messenger on the way should divert the stock and transfer it to a bona fide purchaser, for value, such a transfer would not estop the owner from asserting title, for the reason that the owner had never conferred upon such a messenger an apparent title or the indicia of ownership."

Bliven became lawfully possessed of the stock certificates for a special purpose, and if, as defendants say, he delivered the certificates to them claiming ownership of the stock in himself or his brother, then he at that moment converted both the certificates and the stock, for:

"If a person in the rightful possession of chattels under permission of the owner, with the right to make a particular use of them, makes an unauthorized use of them, this terminates his right to their use and amounts to a conversion." 28 A. & E. Ency. of Law, 695; Laverty v. Snethen, 68 N. Y. 522, 23 Am. Rep. 184; Soltau v. Gerdau, 119 N. Y. 380, 23 N. E. 864, 16 Am. St. Rep. 843.

The subsequent procuring by the defendants of the certificates to be transferred to themselves was prima facie a conversion. A con-

structive conversion takes place when a person does such acts in reference to the goods of another as amount in law to appropriation of the property to himself. Every unauthorized taking of personal property, and all intermeddling with it, beyond the extent of the authority conferred, in case a limited authority has been given, with intent so to apply and dispose of it as to alter its condition or interfere with the owner's dominion, is a conversion. Laverty v. Snethen, supra. When property has been converted by one person and afterwards delivered to another, trover may be maintained against the latter as well as against him who originally converted it. Soltau v. Gerdau, supra; Hall v. Wagner, supra.

The claim of title by Bliven was a conversion by him; the crediting of stocks to the account of a third person was an intermeddling with them, an interference with the owner's dominion, an apparent transfer of her dominion to a third person, a conversion. But, it is claimed that the defendants acted in good faith, relying upon Bliven's claim of ownership, and that the plaintiff was negligent in enabling him to make the claim, and is therefore estopped from recovering the value of the stocks from the defendants. But the defendants testified that they relied absolutely on nothing else but the statement of C. A. Bliven as to the ownership of the stocks. It was said in Spraights v. Hawley, 39 N. Y. 441, 100 Am. Dec. 452:

"It is only when the owner has parted with the legal title upon some secret trust or condition, or has done something calculated to mislead, upon which a third party has a right to rely, and on which he does rely as evidence of authority, that such maxim (viz., that, where one of two innocent persons must suffer by the wrongs of another, the one who enabled such other to commit the wrong must bear the consequences) could have any application. * * * Mere possession of another's property is not such evidence of ownership or authority to sell that third persons have a right, as against the true owner, to rely thereon. They may act in faith thereof, if they please, but they must rely upon the party with whom they deal. and look to him for indemnity if the title fails, or they be deceived or defrauded into a condition of responsibility."

Bliven was employed by the defendant as a mere clerk at $50 a week. They knew he had been previously employed at that salary and was out of employ at the time they took him. His mere possession, under such circumstances, of such an amount of stock, his indefinite statement of having received them, upon an indebtedness to him or his brother, from a person then deceased, and that they belonged to him or his brother, should have created suspicion as to the truth of the claim. It appeared upon two of the certificates that the statement was not true. They stood in the name of the deceased, Kilmer, indorsed by him, but not so as to confer title upon Bliven or anybody else, a fact which the defendants and their cashier discovered and informed Bliven at the very time they received the certificate and credited the stock to the Bliven account. The defendants had a special notice from Bliven himself that they were dealing with the assets of the estate of the deceased owner in the hands of an entire stranger without any indicia of ownership or apparent title in him, and upon his mere naked claim of title, contradicted by the papers themselves, in the absence of any representative of the estate, and without a pretense

or right of claim under any such representative. If a party has sufficient information to put a prudent man upon inquiry, and he neglects to make inquiry, the inference of actual notice is necessary and absolute. In the Soltau Case, 119 N. Y. 380, 23 N. E. 864, 16 Am. St. Rep. 843, the defendant advanced money to one Smith upon faith of a negotiable warehouse receipt in Smith's own name and possession; and yet Earle, J., said:

"Here the defendant could have inquired into the title of Smith before he took the rubber in pledge, and his loss is due, not to any wrong, neglect, or misplaced confidence of the plaintiff, but to his own neglect and abused confidence."

The mere fact of Bliven's possession of the assets of the estate of a deceased person, without apparent title, yet claiming it, was sufficient to put the defendants upon inquiry.

The learned court charged:

"If, believing that the stocks were delivered by Mrs. Kilmer to Bliven in the manner testified to by her, you nevertheless believe that Bliven took them to the defendants, representing to them that his brother, Henry C. Bliven, was the owner, and that the defendants, believing such representations, and without knowledge of what transpired between Mrs. Kilmer and Bliven, received the stocks and credited them on their books to the account of H. C. Bliven, Jr., and allowed a credit for their value, and afterwards, balancing the account, delivered them to the firm of Waterman, Anthony & Co., upon the transfer of Henry C. Bliven, Jr.'s, account to said firm on July 6, 1906, then you must find for the defendants."

To that portion of the charge the plaintiffs duly excepted.

We think that this was error. It confined the attention of the jury solely to the consideration of whether the defendants believed the representations of Bliven, and eliminated entirely the matters hereinbefore alluded to, which, in the absence of written indicia of ownership in Bliven, were in our judgment enough to put them to their independent inquiry.

The court declined to instruct the jury in any way that if Bliven obtained the possession of the certificates for a specific purpose, and then diverted them to his own use, he was a wrongdoer, and could convey no better title than he had, but treated the certificates as negotiable instruments, in spite of the fact that, when the defendants originally credited them to the Bliven account, the New York Central and the Rubber certificate were not negotiable, and that at no time was there written indicia of title in Bliven.

The judgment should be reversed and a new trial granted, with costs to the appellant to abide the event. All concur.