REICHARD v. HUTTON et al.

(Supreme Court, Appellate Division, Third Department. July 8, 1913.)

1. ESTOPPEL (§ 75*)—CLOTHING ANOTHER WITH AUTHORITY—CORPORATE STOCK.
Plaintiff, who, having negotiated with B., an employé of defendants, "E. F. H. & Co.," brokers, authorized to receive stock on their behalf, to loan stock to them, was not as matter of law guilty of such negligence as to prevent her recovering of defendants for conversion of the stock, B. having disposed of it to defendants as his own, and they having sold it, because, he having represented to plaintiff that it was necessary to have the stock in defendants' name that they might use it as collateral, she signed an instrument, prepared on their paper, and brought to her by him, reciting: "This is to certify that I pass title on * * * shares * * * standing in my name to B., and give him power to transfer the above certificate to the name of E. F. H. & Co."
[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 192–195; Dec. Dig. § 75.*]

2. TROVER AND CONVERSION (§ 17*)—STOCK IN BROKER'S HANDS.
Though stock delivered by plaintiff to B., an employé of defendants, brokers, authorized to receive stock on their behalf, to be held by de-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

936 142 NEW YORK SUPPLEMENT (Sup. Ct.

fendants and sold for plaintiff's benefit when it reached a certain price, stood in "street names," and was indorsed in blank, they were liable for its conversion, B. having disposed of it to them as his own, and they having sold it, plaintiff not having neglected any proper precaution.

[Ed. Note.—For other cases, see Trover and Conversion, Dec. Dig. § 17.*]

3. LARCENY (§ 15*)—POSSESSION FOR SPECIAL PURPOSE.

The taking and conversion of chattels with felonious intent by one having possession of them with consent of the owner, such possession being given only for a special purpose, is larceny.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 39–42; Dec. Dig. § 15.*]

4. SALES (§ 226*)—CHATTELS BOUGHT FROM THIEF.

One buying chattels from one having larcenous possession gets no title, and, so having disposed of them, is liable for their conversion.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 626–644; Dec. Dig. § 226.*]

Appeal from Special Term, Rensselaer County.

Action by Harriet N. K. Reichard, administratrix of Charles E. Kilmer, deceased, against Edward F. Hutton and others. From a judgment on a verdict for plaintiff, and from an order denying a motion for new trial, and from an order granting an additional allowance, defendants appeal. Affirmed.

See, also, 131 App. Div. 625, 116 N. Y. Supp. 127; 148 App. Div. 813, 133 N. Y. Supp. 44.

Argued May term, 1913, before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

William F. S. Hart, of New York City (D. Cady Herrick and Millard F. Tompkins, both of New York City, of counsel), for appellants.

Henderson Peck, of New York City, for respondent.

WOODWARD, J. Charles E. Kilmer, a resident of Rensselaer county, died on the 23d day of March, 1906. At the time of his death he was the owner of 100 shares of the capital stock of the New York Central & Hudson River Railroad Company (hereinafter referred to as Central stock), 100 shares of the first preferred stock of the United States Rubber Company (hereinafter referred to as the Rubber stock), and 500 shares of the Columbus Hocking Coal & Iron Company stock (hereinafter referred to as the Columbus stock). The widow of Charles E. Kilmer (who has since married and is the plaintiff in this action) was duly appointed as administratrix, and as such became the owner of this property. She brings this action in her representative capacity to recover damages for the conversion of the stocks above referred to, and the jury who were called upon to pass upon the controverted questions of fact have found a verdict in her favor for the full amount of her claim; the defendants appealing from the judgment and from orders entered denying a new trial and granting an extra allowance.

The plaintiff on coming into possession of the estate of her late husband found the stocks above enumerated. The Central stock cer-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tificate made to Charles E. Kilmer had been indorsed in blank under the name of C. E. Kilmer, and the plaintiff claims that she procured Miss Foshay, who had been her husband's stenographer, to fill in the blanks with the names of Mrs. Kilmer and her daughter, as the assignees, and sent it to the office of the railroad company to have two certificates of 50 shares each made to herself and daughter; that the railroad company refused to make the transfer because the indorsement had been made with the initials, instead of the full name of the person owning the stock, the rules of the company requiring that the signature should correspond with the name upon the face of the certificate. Being advised by a friend that she had better procure the services of a broker to straighten out the matter, the plaintiff found among her husband's papers some correspondence carried on by one C. A. Bliven upon the stationery of E. F. Hutton & Co., bankers (the defendants in this action), in relation to the purchase of some of the stocks and showing that the transactions had been closed through checks of her husband payable to the order of E. F. Hutton & Co., and which checks had been used in due course of business, and she sent her son-in-law to the office of the defendants to find Mr. Bliven for the purpose of enlisting him in the work of getting the transfer of this Central stock. Mr. Swinnerton, the son-in-law, found Bliven occupying a desk in the defendants' office, and it is conceded that he was employed by the company at the time of the transaction with the plaintiff, though he does not appear to have been so employed at the time that he acted in behalf of Mr. Kilmer in the purchase of the Columbus stock, although his purchases for Mr. Kilmer were ratified and consummated through the defendants' banking house; the checks in payment being drawn to their order and duly used. Bliven called upon the plaintiff at the office formerly occupied by her husband, and the Rubber stock being in the same situation as the Central stock both of these were given to Bliven for the purpose of having him take them to the defendants' firm, and procuring the transfers upon the books to the plaintiff and her daughter. There does not seem to be any question that this was the limited purpose for which Bliven was intrusted with these stocks, and it is admitted on the record that Bliven had authority to receive stocks on behalf of the defendants, though it is asserted that he had no power to receipt for them on behalf of the defendants, a proposition which would not ordinarily be true, for the giving a receipt is but incidental to the authority to receive, and the greater always contains the less. Broom's Legal Maxims (8th Ed.) 174. Bliven, disregarding the purpose for which he was intrusted with these stocks, took them to the defendants' firm, and represented that the certificates belonged to him, claimed that they had been transferred to him during the lifetime of Mr. Kilmer in payment of a debt which Mr. Kilmer owed to him or his brother, and defendants took these certificates, which upon their face showed that the title was in the plaintiff and her daughter for their names had been inserted in the blanks, and gave Bliven credit upon their books in a speculative account which Bliven was carrying in the name of his brother to avoid a technical rule against permitting employés to main-

tain such accounts. These stocks appear to have been credited to Bliven on the 20th day of April, 1906, and there would seem to be no possible question that at that time the defendants had notice, in the form of the indorsement, in the apparent assignment of the certificates to the plaintiff and her daughter, and in the actual knowledge that Mr. Kilmer was dead, which called upon them to make inquiry before accepting them and giving credit to Bliven for property which belonged to the plaintiff as administratrix of Mr. Kilmer's estate. Bliven was allowed to trade upon these stocks so placed to his credit, and subsequently the defendants transferred this account, with the stocks, to another banking house, and received from that house an equivalent for the transfer, so that, when the plaintiff made a demand for her stock, the defendants were unable to deliver the same, and they declined to recognize her in connection with the transaction, resulting in the present and some previous litigation.

Bliven, who is now recognized as having deceived both parties, and having been convicted of a larceny of these same stocks, evidently realized that his account was not safe; that the plaintiff would be making demands upon him, and to meet this condition he told the plaintiff that it would take some little time to get the stocks transferred; and that, if she would loan the stocks to the defendants' firm, they would pay her for the use thereof at the rate of 2 per cent. per annum, and that she would receive the dividends and any rights which might accrue thereon, and she made this arrangement with Bliven, though it seems to be conceded at this time that Bliven had no such arrangement with the defendants, and that his story in relation thereto was entirely false. Subsequent to this, arrangement Bliven entered into an arrangement with the plaintiff by which the Columbus stock was delivered to him with the understanding that the defendants' firm would hold the same until it reached $30 in the market, when it was to be sold and the proceeds turned over to her. This Columbus stock, instead of being held for sale at the agreed price, was taken to the defendants, and by them credited to the Bliven account on the 26th day of April, 1906, and this, with the other stocks, was transferred to Waterman, Anthony & Co., and the defendants on demand being made refused to recognize the plaintiff in connection with the stocks. The learned court charged the jury that this constituted conversion, explaining that the defendants were innocent of the scheme by which the fraud was consummated, but that in law the result was conversion of the property belonging to the plaintiff in her representative character, and made them liable in this action unless the plaintiff had estopped herself by reason of the alleged execution of certain instruments referred to as Exhibits P, Q, and R, the latter being alleged to have been executed by the daughter, or unless by her course of dealing with these stock certificates and her course of dealing with Bliven she has been guilty of such negligence or carelessness in respect to the rights of the defendants as makes it unjust and inequitable that she should be permitted to assert her claim of title against them.

There was a sharp conflict in the evidence as to these exhibits. None of these alleged exhibits made their appearance upon the original trial

of this action. They did not appear in the trial of Bliven for grand larceny in the theft of these same stocks, and it was only upon a retrial, after a reversal of the judgment in favor of the defendants (Kilmer v. Hutton, 131 App. Div. 625, 116 N. Y. Supp. 127), that they were brought forward, resulting in a withdrawal of that action and the subsequent bringing of the present action. The plaintiff and her daughter, both of whom are alleged to have been present with Bliven when these exhibits are said to have been executed, say positively that they never signed the exhibits. Bliven, who admits having committed perjury and who is now serving a term of imprisonment for stealing these same stocks, says that they did. Three disinterested witnesses testify that Catherine E. Swinnerton, the daughter, was in the state of Vermont on the day that these exhibits were signed, and the evidence is clearly preponderating that these exhibits are forgeries. If this is true, they can have no possible weight in this controversy, but it is urged that the verdict of the jury did not necessarily determine this question, as the learned court permitted the jury to find that, even though these exhibits were genuine, it was still for the jury to determine whether the plaintiff was estopped by reason of her course of dealing with these certificates. We are clearly of the opinion that the jury could not have discharged its duty with intelligence, and held that these exhibits were signed by the plaintiff and her daughter. The story in substance is that some time subsequent to the crediting of Bliven's account with the Central and Rubber stocks one of the defendants' firm conceived the idea that it was necessary to have some written indicia of ownership in Bliven (and the lack of this was made conspicuous in the opinion of the court upon the original appeal), and this member claims that he prepared these several exhibits, submitted them to others, and then intrusted them to Bliven for the purpose of having him procure the signatures. It will be noted, when we come to set out the exhibits (which are in substance alike, and only one need be quoted), that they are admirably designed to give color to Bliven's scheme of a pretended loan to the defendants while entirely unique as a method of transferring stock certificates, and the claim that these exhibits were a matter of so much consideration on or about the 11th day of May, 1906, and that they were entirely forgotten in all of the subsequent controversy for nearly four years, calls for a degree of credulity which is often found lacking in intelligent juries.

[1] Assuming, however, that these exhibits were prepared as stated, and that they were given to Bliven to procure the signature of the plaintiff and her daughter, he was held out to them as being authorized to procure these signatures to papers prepared in the defendants' bank, upon their own letter heads, and it certainly placed him in a position to work the very wrong which he had already undertaken, and they are hardly in a position to urge that the plaintiff was negligent in signing the papers which a reputable banking house had sent to her by its own representative. He could not have procured an assignment of these stocks without consideration if the defendants, or Bliven acting in their name, had not cleverly covered up the real purpose, and this goes far to negative the idea that the plaintiff was in any degree

negligent of her duty in respect to these transactions. Taking either horn of the dilemma, we are unable to discover any reason to differ with the jury in its conclusions. Let us look then at Exhibit Q. It reads as follows:

"E. F. Hutton & Co.

"May 11, 1906.

"Messrs. E. F. Hutton & Co., 33 New Street, City.

"Dear Sirs: This is to certify that I pass title on 50 shares of New York Central standing in my name to Mr. C. A. Bliven, and give him power to transfer the above certificate to the name of E. F. Hutton & Co.

"I also guarantee the endorsement on the back of the certificate for 100 shares of New York Central, signed C. E. Kilmer, to be signed by the same person represented on the face of the certificate as Chas. E. Kilmer.

"Yours very truly,          Harriet N. Kilmer, Admx.

"Estate of Charles E. Kilmer."

Bliven, it will be remembered, had negotiated to have this stock loaned to E. F. Hutton & Co., and he had represented to the plaintiff that it was necessary to have the stock in the name of this company that it could be used as collateral, and this paper was admirably designed to mislead the plaintiff and to allay suspicion. It did not authorize Bliven generally to deal with the stock; to transfer it to any one whom he might choose. It merely made him the conduit to "transfer the above certificate to the name of E. F. Hutton & Co." It is not a power to transfer absolutely, but to transfer it to "the name of E. F. Hutton & Co.," and this is exactly the arrangement which the plaintiff made with Bliven; the stock was to be transferred as a loan. No title was to pass; it was to stand in the name of E. F. Hutton & Co., to be used by them as collateral for a consideration of 2 per cent. per annum, but the ownership was to remain in the plaintiff, and if the defendants could have known all that Bliven knew, and if they had been interested in promoting his fraud, they could not have hit upon a more enticing cover for the fraud than is to be found in this exhibit which it is claimed was prepared by the defendants. If we accept the defendants' present contention, therefore, and assume that the plaintiff and her daughter did in fact sign these exhibits, the jury could not have come to any other intelligent conclusion under the testimony than that the defendants had by their conduct placed it in the power of Bliven to consummate this wrong, and that they could not have gained any title to this stock which the plaintiff never parted with. It does not seem within the range of reasonable probabilities that the defendants drew this exhibit, which is so out of the ordinary in form, and which so admirably fits into the plans of Bliven. It is easy to understand how Bliven, knowing the result which he desired to accomplish, might have designed this paper either with the purpose of securing the signatures or for the purpose of forging them; but that the defendants should have hit upon the exact phraseology which would fit Bliven's crime and aid in deceiving the plaintiff and her daughter, and should have sent Bliven out to get these signatures, is almost unthinkable. If they had come to doubt Bliven's word about the ownership of this stock, it was certainly very remarkable that they should have relied upon him to get the signatures without making in-

quiries, while, if they believed in him and held him out to the plaintiff as worthy of the confidence which the nature of the errand implied, they are not to be heard to say that the plaintiff was negligent in relying upon this same representative in the entire transaction. The presumption of innocence of wrong which belongs to the defendants forbids that we should suggest that they were parties to the frauds of Bliven, and reason forbids belief in the story that these exhibits were prepared by the defendants, or that they knew anything about them until long after the stocks had been converted. Certainly if the defendants knew of these exhibits, and they were the subject of consultation in 1906, they would not have been forgotten in December of that same year when the plaintiff demanded her securities, nor in all the litigation which followed for nearly four years, and the most likely thing is that the exhibits were forged by Bliven, if they, in fact, had any existence at the time or in connection with the transaction. But in either view the verdict of the jury is supported by the evidence, and, if not contrary to law, should be affirmed.

[2] It is urged that there is a difference between the Central and Rubber stocks and those of the Columbus Company, in that the latter stood in "street names," indorsed in blank, and were transferrable by delivery under the usage of Wall street, but we are of the opinion that, the plaintiff owning these stocks as administratrix and parting with them only upon the limited condition that they were to be held by the defendants to be sold for her benefit when they should reach a certain price, the latter could not get title to them because its own agent claimed to own them, unless the plaintiff had been guilty of negligence in dealing with Bliven in the manner which she did, and the defendants, under the evidence in the record now before us, are hardly in a position to say that they did not hold Bliven out as their representative in this and the previous transactions with the plaintiff. We think the rule of law is not different in the two instances, and that the rule laid down by the court is within the authorities. If the plaintiff was seeking to recover from Waterman, Anthony & Co., to whom the defendants transferred this stock, different questions would be presented, but here the defendants placed Bliven in a position to work this wrong, and the plaintiff not having neglected any proper precaution— for this must be the effect of the jury's determination whether the exhibits above referred to were forgeries or not—the defendants never had any right to convert the stock to their own use, and having done so they must respond in damages to the plaintiff.

[3, 4] By the larcenous taking of chattels the owner is not divested of his property, and a transfer to a purchaser does not impair the right of the true owner. A purchaser of stolen goods, either from the thief or from any other person, although in the ordinary course of trade and in good faith, will not give title as against the owner. Larceny has been defined as " 'the felonious taking the property of another, without his consent and against his will, with intent to convert it to the use of the taker' (Hammond's Case, 2 Leach, 1089), or 'the wrongful or fraudulent taking and carrying away by any person of the personal goods of another, with a felonious intent to convert them

to his (the taker's) own use and make them his own property without the consent of the owner' "—citing authorities. "The fraudulent and wrongful taking being proved with the felonious intent, the animo furandi, the only question remaining in any case is whether the taking was with the consent of the owner; for if so, although the consent was obtained by gross fraud, there is no larceny. But the consent must be to part with the property, and not the naked possession for a special purpose. If the owner does not intend or consent to part with his property, then the taking and conversion of it with a felonious intent by one having possession of it, as the property of the owner and for a special purpose is larceny. If it appear that, although there is a delivery by the owner in fact, yet there is no change of property nor of legal possession, but the legal possession still remains exclusively in the owner, larceny may be committed as if no such delivery had been made." Bassett v. Spofford, 45 N. Y. 387, 391 (6 Am. Rep. 101), and authorities there cited; Soltau v. Gerdau, 119 N. Y. 380, 389, 23 N. E. 864, 16 Am. St. Rep. 843, and authorities there cited. There would seem to be no doubt that Bliven's possession of the plaintiff's stock was larcenous, and that he never had any legal title to the stock, and that the defendants could not get title through him. Having converted the stock, they are now bound to respond in damages, the case of Soltau v. Gerdau being ample authority for this conclusion.

We do not find legal error in the record, and the judgment and orders appealed from should be affirmed, with costs. All concur; SMITH, P. J., and LYON, J., in result.