LUIS REGUERA, Appellant, *v.* VICTOR M. CALDERON et al., Respondents.

First Department, May 11, 1967.

*Irwin M. Taylor* of counsel (*Stanley P. Siegel* with him on the brief; *Harry Wallach,* attorney), for appellant.

*Michael Permut* of counsel (*Morris Permut* and *Stephen H. Finkelstein* with him on the brief; *Permut & Permut,* attorneys), for respondents.

RABIN, J. In September of 1959 plaintiff's assignor Aceites Roig, S. A., a Spanish distributor of olive oil, engaged Jose M. Calderon, Inc., a New York food broker, as its agent in the sale of a quantity of Spanish edible olive oil. Jose M. Calderon, Inc., acting as such agent for Roig, entered into a contract for the sale of the olive oil to Pompeian Olive Oil Corporation of Baltimore, Maryland. Pursuant to the contract, an irrevocable letter of credit was opened by the purchaser in favor of Roig. The letter of credit contained a provision that the olive oil was to be shipped no later than October 31, 1959. The olive oil was shipped at a later date and in consequence the purchaser refused to accept delivery and revoked the letter of credit. As a result of Pompeian's failure to accept delivery, these perishable goods remained in a warehouse in Baltimore, with costs and charges accruing daily. Roig, thereupon, contacted Jose M. Calderon, Inc., and authorized that agent to sell the olive oil at the best price possible. In order to effect the sale it was necessary to have all the costs paid, including the cost of shipment to Maryland, customs duties, demurrage, warehouse freight and insurance. The agent, after deducting 3% of the sales price as his commission, and after deducting the various charges above mentioned, was to remit the net proceeds to Roig. To accomplish the ultimate sale of the olive oil, Roig advised its bank in Spain to send a cablegram to the First National Bank of Baltimore, instructing that bank to transmit title documents to the olive oil to Jose M. Calderon, Inc. On December 15, 1959, the Baltimore bank did transfer the title documents to William H. Masson, Inc., of Maryland, who acted as customs broker for the Jose Calderon Corp. The title documents were made subject to the order of Jose M. Calderon, Inc., and thus the goods were placed within the agent's complete control.

Jose M. Calderon, Inc. did not possess the necessary funds to pay the various charges above mentioned and, therefore, found it necessary to enter into an agreement with defendant, Victor M. Calderon, Inc., in order to raise the necessary funds. That arrangement provided that Victor M. Calderon, Inc. was to pay the various charges on condition that it be allowed to invoice the sales, collect the proceeds, and after deducting the

necessary charges advanced, and a 1½% commission, transmit the balance to Jose M. Calderon, Inc. To enable the Victor Calderon Corp. to consummate a sale, if it found a buyer, the customs broker Masson was instructed by Jose M. Calderon, Inc. to hold the goods for the account of Victor M. Calderon, Inc.

It is the contention of the plaintiff that the agent, Jose M. Calderon, Inc. acted beyond the scope of its authority in making the aforesaid arrangement with the defendant corporation, because it asserts that the arrangement in effect constituted a pledge which the agent was unauthorized to make. With this we cannot agree. Under all the circumstances, the agent acted well within the scope of its authority and merely took the reasonable and necessary steps to effectuate the ultimate sale of the goods involved, as authorized by its principal. In reaching our conclusion we need not rely upon the Factors' Act. (Personal Property Law, § 43, repealed Sept. 27, 1964.) That act deals with the apparent authority of an agent. Here, as already indicated, the agent acted pursuant to the authority necessarily implied.

We recognize that the general rule is that an agent who is authorized to sell is not also authorized to pledge. However, basically, the cases which have so held involved situations where the pledge was not in furtherance of the agency. (See *Shaw* v. *Saranac Horse Nail Co.,* 144 N. Y. 220; *Porges* v. *United States Mtge. & Trust Co.,* 203 N. Y. 181.) But, at any rate, the facts of this case present a situation, the exigencies of which point to the conclusion that the parties contemplated that the Jose M. Calderon Corp. do exactly what it did. Perishable goods had been shipped from Spain to Maryland, and there they remained in storage without a buyer, with charges against them mounting daily. Indeed, the record indicates that the market price on these goods was in a state of flux. The parties had to act quickly. The owner of the goods had to salvage whatever it could from the shipment. To effectuate the sale of the goods and to allow for expedition, documents of title were transferred to the control of the agent. Indeed, this transfer of documents was contrary to the form that the prior rejected sale had taken, for in that case documents of title were shipped to the bank to be delivered only against the letter of credit. Here the agent had to be placed in a position of control over the goods so that it could act quickly in order that the goods might be salvaged. The necessary charges which the agent had to pay in order that the goods might be sold, were approximately $6,000, a very considerable amount when com-

pared to the sum of $30,000, which was approximately the amount for which the goods were ultimately sold. In the light of the circumstances, the authority conferred upon the agent included the authority to do all the things necessary to effect the sale of the goods and make delivery thereof possible. (See 2 N. Y. Jur., Agency, § 84.) Of course, the payment of the various charges being a condition precedent to the consummation of the sale and delivery of the goods, it can be inferred that the agent did in fact have the authority to pledge the goods in order to raise the necessary funds to effectuate the ultimate sale of the goods.

Therefore, when the agent paid off the obligations, which were liens against the property, effectuated the ultimate sale of the goods, and received the proceeds of the sales, he did exactly what he was authorized to do. The arrangement made between the agent and the defendant corporation, looking towards the sale of the goods, did not constitute a conversion.

There is no doubt that the defendant corporation turned over all the net proceeds of the sales to the Jose Calderon Corp., the agent of Roig. The loss to Roig occurred as the result of the defalcation of the agent who was chosen by Roig, itself. What is lost sight of here by the plaintiff is that the agent was not only empowered to effectuate the sale of the goods involved, but was also an agent to receive the proceeds of the sale. If the agent had sold the goods directly to the defendant corporation or to a third party and then upon receipt of the funds had failed to turn over, there could be no claim as against the defendant or the third party. In that situation it would be entirely clear to all concerned that the agent acted within the scope of its actual authority. That the agent did not directly sell to the defendant corporation, but instead used the defendant corporation as a conduit to sell to a third party, does not alter the situation. It cannot be said that any loss occurred as a result of the form in which the transaction was arranged.

Accordingly, the judgment entered December 2, 1965 should be affirmed with one bill of costs and disbursements to the defendants.

McNALLY, J. (dissenting). This action is in conversion. Plaintiff's assignor, Aceites Roig, S. A., in September, 1959 owned 50,000 kilos of Spanish pure edible olive oil located in Spain. Roig employed Jose M. Calderon, Inc. to sell the olive oil in the United States of America. Jose sold the oil on September 4, 1959 to Pompeian Olive Oil Corp. of Baltimore. Pompeian rescinded the purchase because of delayed delivery. On December 15, 1959 the title documents to the oil were delivered

to William H. Masson, Inc. of Maryland. Masson was customs broker for Jose. Roig had instructed Jose to sell the oil and submit to arbitration its claim against Pompeian. Jose was to pay all costs, including shipment to Maryland, customs duties, demurrage, warehousing, freight and insurance and, after deducting 3% of the sales price, remit the proceeds to Roig.

In December, 1959 Jose arranged with his brother, the defendant Victor M. Calderon, for the advance by his corporation, the defendant V. M. Calderon, Inc., of the funds required to pay the expenses incident to the proposed sale of the olive oil. Jose authorized V. M. Calderon, Inc. to invoice the sales of the olive oil and to reimburse itself for expenses of the sales, and after paying to itself 1½% of the total sales price, to remit to Jose. Defendants sold the olive oil. The sales price and reasonable value of the olive oil was $30,040.53, of which Roig has received no part except $2,500.

Finding "21" is that "Roig knew or should have known that Jose M. Calderon, Inc. did not have sufficient funds at its disposal to cover the shipping charges, customs fees, demurrage and warehousing costs, etc., as called for by its agreement with Roig." There is no evidence to support this finding.

The trial court properly found plaintiff's proposed finding number "Twentieth" that at the time of the transfer to Victor and his corporation they knew that Jose was the agent for Roig and under the duty to remit the proceeds of the sale to Roig. The evidence in support of said finding is compelling. In September, 1959, Roig transmitted to Victor 30,000 pesetas ($500) for payment to Jose under Roig's agency agreement with Jose to enable Jose to pay Pompeian said sum to close the sale to Pompeian later rescinded by it. Victor knew Jose was without funds to pay the charges on the olive oil to be sold following the rescission of the Pompeian sale. The checks of defendant corporation to Jose bore the legend "On account Roig oil consignment". Implicit in the provision for payment of 1½% commissions to defendant corporation, which is one half of the customary commission of 3%, is an arrangement to share Jose's commission as broker, as opposed to a commission incident to a sale of Jose's property.

Jose's authority to sell did not enable a pledge. (*Shaw* v. *Saranac Horse Nail Co.*, 144 N. Y. 220, 224; *Howland* v. *Woodruff*, 60 N. Y. 73, 79; *Potter* v. *Hodgman*, 81 App. Div. 233, 235, affd. on opn. below 178 N. Y. 580.) Had Jose advanced the expenses of the sale, he would have been entitled to reimbursement and had a lien therefor against the documents of title and the olive oil. Jose, however, was not authorized to assign

or pledge either the documents of title or the goods without the express authority of Roig, nor was Jose authorized to delegate to defendants the power to sell the olive oil. The record does not support the implied power to do so. We may not assume Roig would have entrusted Jose with the documents of title if Roig had known Jose was financially unable to advance the necessary funds on the security of the documents of title.

Respondents' principal reliance is on the Factors' Act (Personal Property Law, § 43, repealed Sept. 27, 1964). Thereunder a factor or agent entrusted with possession of documents of title or with possession of the goods is deemed the owner thereof as to any purchaser or lender " upon the faith thereof." The trial court found and the evidence establishes Jose did not have possession of the title documents or the olive oil when the alleged transfer was made to defendants-respondents. The alleged constructive possession by Jose does not satisfy the requirements of the statute. (*Howland* v. *Woodruff, supra; Dorrance* v. *Dean,* 106 N. Y. 203.) Cf. *Dyer & Co.* v. *Monitz, Wallack & Colodney* (16 Misc 2d 1033, mod. 12 A D 2d 594, affd. 11 N Y 2d 654) where defendant-respondent relied on a negotiable bill of lading covering a shipment of sugar duly indorsed in blank by the owner's representative. Moreover, the Factors' Act is not available to defendants-respondents because they in fact knew Jose was not the owner of the olive oil.

Pledging the olive oil and authorizing defendants-respondents to sell it and receive the proceeds thereof constituted a conversion thereof. Defendants-respondents knowingly participated in the conversion. (*Kilmer* v. *Hutton,* 131 App. Div. 625, 636–639.) That defendants-respondents allegedly accounted to Jose is irrelevant. It may not be assumed that Roig would have either authorized Jose's arrangements with the defendants-respondents or that Roig would have entrusted Jose as agent to sell if informed of its financial inability to advance the preliminary expenses of the sale of the olive oil.

Plaintiff-appellant is entitled to judgment in the sum of $30,040.53, the reasonable value of the goods, less $2,500 and the reasonable expenses of the sale thereof.

EAGER, J. P., STEUER and CAPOZZOLI, JJ., concur with RABIN, J.; McNALLY, J., dissents in opinion.

Judgment affirmed, with $50 costs and disbursements to the respondents.