## Gafford v. Stearns.

### Detinue for Bale of Cotton.

1. *What title will support action.* — Possession, and the right of possession, accompanied by a lien for the payment of money advanced, or a debt previously contracted, entitles the plaintiff to maintain detinue against any one disturbing his possession.

2. *Mortgage and crop lien for advances; construction and registration of.* — An instrument of writing, which, by apt words, conveys the grantor's growing crop and other personal property, to secure the payment of a promissory note given for advances supplied to him; conditioned to be void if the note is paid at maturity, and containing a power of sale in the event of a default, — is a mortgage, although the note may also contain all the requisites of a statutory lien for advances (Rev. Code, §§ 1858–60); and the failure to record it within sixty days, which is necessary to its validity as a statutory lien, does not prevent it from operating as a mortgage against all persons except creditors and purchasers without notice.

3. *Verbal agreement for lien on crop, between landlord and tenant, or between tenants in common.* — A verbal agreement between landlord and tenant, that the landlord shall have a lien on the tenant's crop for supplies furnished him, or a similar agreement between two tenants in common, is not obnoxious to any provision of the statute of frauds (Rev. Code, § 1862), but is valid and operative against all persons except *bonâ fide* purchasers without notice.

4. *Who is bonâ fide purchaser without notice.* — When a mortgage is taken as a security for the payment of an antecedent debt due from the mortgagor to the mortgagee, the latter does not occupy the position of a *bonâ fide* purchaser without notice, but is affected with all the equities binding on the mortgagor himself.

5. *Lien created by valid verbal contract.* — When a party has a lien on goods or chattels, created by a valid verbal agreement with the owner, and the goods have been delivered to him pursuant to the terms of the contract, his right to retain them until his lien is satisfied is not affected by any subsequent mortgage, or other incumbrance, executed or created by the owner; and he may maintain detinue against any one who disturbs his possession.

6. *Severance of tenancy in common.* — Tenants in common of a growing crop may make a partial division of it among themselves as it is gathered; and when this is done, each holds in severalty the part alloted to him, while they remain tenants in common of the undivided residue.

7. *Outstanding title in third person; when available to defendant.* — In an action of detinue, the defendant cannot set up an outstanding title in a third person, without connecting himself with it.

8. *Statute of frauds; executory and executed contracts.* — The statute of frauds, requiring certain contracts to be reduced to writing, applies only to executory contracts; and if the parties to a contract have voluntarily executed it, a stranger cannot be heard to question its validity under the statute.

APPEAL from the Circuit Court of Butler.

Tried before the Hon. P. O. HARPER.

This action was brought by John D. Stearns against Jere. D. Gafford, and was commenced on the 14th November, 1870. The only plea was the general issue, "in short by consent, with leave to give in evidence any matter that might be specially pleaded;" and the cause was tried on issue joined on that

VOL. LI.

[Gafford v. Stearns.]

plea. The bale of cotton sued for was raised on land which belonged to the plaintiff, and which he had rented, for the year 1870, to Pearman and Harbinson; and the plaintiff's testimony conduced to show that it was taken from his possession by the defendant, without his knowledge or consent, after it had been delivered to him by said Harbinson and one James H. Turner, who had cultivated a part of the rented land, under an agreement with plaintiff and his said tenants. The defendant claimed the cotton under a written instrument, or mortgage, executed to him by said James H. Turner, which is hereinafter set out; and his testimony tended to show that the cotton was delivered to him by said Turner, while it was lying at plaintiff's gin-house. The transcript filed in this court having been lost, the reporter has procured the original bill of exceptions from the clerk of the circuit court; and he herewith copies it at length, as, on account of several important omissions, it cannot be fairly condensed.

"The plaintiff testified, as a witness for himself, that the cotton sued for was grown on his farm, in the year 1870; that he rented his farm, for that year, to Henry Harbinson and David Pearman, and made with them a parol contract, as follows: Plaintiff furnished the land, and stock to cultivate it, and feed for the stock, and paid the blacksmith bills; Pearman and Harbinson agreed to cultivate the land well, gather the crop, and pay him damages for failing to do so; plaintiff to have one half of the crop, and Harbinson and Pearman the other half; plaintiff to advance supplies of provisions, &c., to them, and the amount of such advances during the season was to be paid to him out of their share of the crops; and they were to have none of the crop, and no interest in it, until he was paid for his advances. Plaintiff testified, that said Harbinson and Pearman commenced work under said contract about the 1st January, 1870, and asked his consent, a few weeks afterwards, to their getting another hand to go in with them, which consent he gave; that Pearman asked him, shortly thereafter, to see the defendant (Gafford), and inquire whether he had hired a negro man for him, as he had promised to do; that he (witness) saw Gafford, and asked him about it; that Gafford replied, he could not get a negro man, but he thought they could get one James H. Turner, a white man, who was driving a wagon for him; that Gafford also asked witness, on what terms the tenants were working, and witness explained the terms fully; that said Turner was not present at this time, but witness thought his wife was; that Gafford said he would see Turner, and tell him the terms, and try to get him to go to work there; that Gafford wrote to witness, a few days afterwards, saying that Turner liked the contract, and wanted to go

in with the boys; that Turner himself came to witness in a short time thereafter, and said that he wanted to go in with Harbinson and Pearman, and witness sent him to them to agree upon terms; that Turner moved his family to witness' house about the 1st March, and went to work with the other tenants under the same contract, and remained there until about the 1st November; that he proved to be a very poor hand, getting drunk frequently, and often quitting work for two or three days at a time, although Gafford had recommended him as a sober, steady, and industrious man; that Turner went away without his consent, and left one third of his crop ungathered in the field, and witness had to hire hands to gather it; that he had advanced to said Turner, during the season, provisions and supplies to the amount of $165.98; and that, even if he gained this suit, Turner would still be indebted to him in a considerable amount. Plaintiff testified, also, that his tenants divided the lands between them some little time after Turner began to work, Pearman taking one portion, and afterwards working by himself, and Harbinson and Turner taking the other part, and working together until Turner quit; that Harbinson and Turner together made about six bales of cotton, and some corn; and that he (witness) got, of Turner's share, two bales and a half of cotton, including the bale here in suit, and about thirty-five bushels of corn, and seven or eight hundred pounds of fodder. He further testified that, about the 1st October, 1870, Harbinson and Turner ginned and packed two bales of the cotton made by them, and rolled them out to one side of the screw, and sent for him, and delivered said two bales to him, as his 'rent cotton,' as they called it, and on account of his half of the crop under the contract; and that the defendant afterwards, in November, 1870, came to his ginhouse soon after daylight, and took away one of said bales, without his knowledge or consent; that he demanded said cotton from defendant while on his wagon, and defendant refused to deliver it up.

" Plaintiff testified, on cross-examination by defendant, that he never hired Turner; that Turner made his contract with Pearman and Harbinson, and he never made any modification of his original contract with them on account of Turner; that defendant did not tell him he had an account against said Turner, until two or three weeks after Turner had begun to work on the place; that he showed Turner his account against him, just before Turner quit work, and Turner agreed it was all correct, except as to six bushels of corn which he had taken from witness; also, that he had never heard of defendant's mortgage, until October, 1870, and never promised, directly or indirectly, to be responsible for defendant's account against

[Gafford v. Stearns.]

Turner, either before or after Turner began to work on his land; that defendant, when he first spoke of Turner as a hand, asked witness to trade with him, but witness replied, that he had already made arrangements to get his supplies in Montgomery; that he did, however, buy a few supplies from defendant, but did not agree to buy his supplies from him, either for himself or his hands; and that he did not remember the exact amount realized from Turner's share of the crop, but he knew it was not enough to cover his indebtedness.

"Plaintiff then examined said Pearman as a witness, who testified, as plaintiff had testified, that plaintiff furnished the land, stock, and feed for the stock, and witness and Harbinson were to cultivate the land well, and gather the crop, or pay damages for not doing so; that plaintiff was to have one half of the crop, but witness and Harbinson were to have none of it, nor any interest in it, until plaintiff was fully paid for supplies furnished them by him; that this contract was made in December, 1869, and was for the year 1870; that he and Harbinson, after they had worked awhile, concluded to take in more land to cultivate, if they could get another hand; that he came to Greenville, and asked defendant to hire a negro man for him, which the defendant promised to do; that he asked plaintiff, who was coming to Greenville a few days afterwards, to inquire of defendant whether he had hired a hand for him; that Turner came to him and Harbinson a few days afterwards, and they told him all about their contract; that he agreed to go in with them on the same terms, and commenced work soon afterwards; that they all three worked together until May, when, by mutual agreement, witness took a certain portion of the land, and tended it by himself, and Harbinson and Turner tended the balance together, but all worked on the same terms with plaintiff as before they separated; that Turner was not a good hand, but would go off, and get drunk, and neglect the crop, and he finally left, about the 1st November, with one third of it ungathered; that plaintiff furnished Turner with provisions, &c., and witness hauled them to him from the depot at Fort Deposit, but he did not know the amount; that witness assisted Turner and Harbinson, about the 1st October, to gin and pack two bales of cotton made by them, which they then rolled aside, and remarked to witness that these bales were rent cotton for plaintiff; that they then sent for plaintiff to come to the gin-house, and delivered the two bales to him in the presence of witness, but he did not remember what was said between them at the time of such delivery. Said witness testified, also, that when Turner came to him to make a contract to work, he said that he had heard what the contract was, but that he had made no contract with plaintiff.

" Henry Harbinson was also examined as a witness by plaintiff, and testified as to the nature and terms of their contract with plaintiff as did Pearman ; and also the same as to Turner making a contract with them to work on the same terms with them ; also, as to the ginning and packing of the two bales of cotton, and their delivery to plaintiff as rent cotton ; also, that he saw defendant come to plaintiff's gin-house, and get the bale of cotton here sued for ; that it was very early in the morning, between daylight and sunrise, when defendant got the bale of cotton ; that he (witness) at once went to plaintiff's house, and told him about it ; and plaintiff asked him to follow the cotton to Greenville, and to see where it was put, and witness did so. Plaintiff proved, also, by one Steiner, that cotton was worth fourteen cents per pound on the 14th November, 1870, and twenty-four cents per pound on the 24th July, 1872.

" Plaintiff having here closed his testimony, defendant testified, as a witness for himself, substantially as follows : Some time in the spring of the year 1870, plaintiff came to his store in Greenville, and asked him to get him a hand to work on his farm in Lowndes county for that year ; and witness told him, that he had said James H. Turner working for him, driving his wagon, and plaintiff could get him, if he would pay or secure Turner's indebtedness to him, witness. Plaintiff then said he was needing one more hand, as he had land and one horse idle ; and that he would see that whatever Turner was owing to witness at that time was paid, and whatever advances witness might thereafter make to Turner during the year, to enable him to make a crop on plaintiff's farm, should be paid out of the first cotton made on plaintiff's land during that year, if witness would allow Turner to quit his employ, and would hire him for plaintiff ; to which witness consented. Plaintiff then told witness, that he would give Turner one half of all he could make on his land that year, would find the stock and feed them, furnish the farming implements, guano (as manure) for whatever cotton he might plant, and cotton-seed (as manure) for whatever corn he might plant, and would physic Turner's family for the rest of the year, free of charge, as he was a practising physician. Witness told Turner of plaintiff's proposal, and consented that Turner might quit his employ and accept the same, if he desired to do so. Turner said, that he would accept plaintiff's offer, as made to him by witness. In a few days, plaintiff returned to Greenville, and talked over the terms of said hiring, as stated, with said Turner and witness, in the store of witness ; and the same was agreed upon by plaintiff and Turner. Witness then gave them the amount of Turner's indebtedness to him at that time, which was $66.13, when plaintiff and Turner both agreed that this indebtedness should be

[Gafford v. Stearns.]

paid out of the first cotton raised by Turner that year on plaintiff's place; and they made arrangements at the same time for witness to advance supplies to Turner during the balance of the time he was cultivating plaintiff's land. Pursuant to this agreement, witness advanced to Turner, from that time to the 26th May, 1870, the sum of $79.89. After the contract of hiring was fully agreed on, plaintiff returned home, and witness put Turner and his family, with their baggage, on the railroad, and sent them to plaintiff, as he had promised. Witness would not have consented to release Turner from his contract, nor hired him for plaintiff, but for the fact that both plaintiff and Turner agreed and promised to pay him Turner's indebtedness out of the first cotton made by Turner on plaintiff's place that year. In May afterwards, plaintiff told witness that Turner was getting restless, and he was afraid he would not remain to make and gather his crop; that he (Turner) had an uncle in Texas, who had been writing to him, and offering him inducements to remove to Texas; and that he had been drunk, and was talking of leaving and going to Texas. Witness then asked plaintiff to go Turner's security for the account due to witness, but plaintiff refused to do so; and witness then told him, that he would go and get a mortgage from Turner, and secure himself; and he did so, and afterwards told plaintiff that Turner had given him a mortgage. In September, or October, 1870, witness sent up for the cotton; when plaintiff sent him back word, that he owed a firm in Montgomery, and was compelled to pay them first, and that witness could not get the cotton until that debt was paid. This was the first intimation witness had of any claim which plaintiff set up to the cotton. Witness went up after the cotton soon afterwards, and arrived at plaintiff's farm, with his wagon, soon after breakfast. He there found said James H. Turner, who delivered the bale of cotton to him, and assisted him and his driver in putting it on his wagon. Witness brought the cotton home to Greenville, and had it weighed, 483 lbs., and immediately gave Turner credit for the amount, which was $63.99. Witness' account against Turner was just, true, and correct.

"The defendant then introduced the deposition of said James H. Turner," which is not copied into the bill of exceptions, and then read in evidence his mortgage from said Turner, which was in the following words: —

"The State of Alabama, Butler County. Know you, that for and in consideration of necessary provisions this day furnished by J. D. Gafford, of the value of one hundred dollars, the receipt whereof is hereby acknowledged, we have this day bargained, sold, and conveyed unto the said J. D. Gafford, the following described property, to wit: four head of cattle, and

[Gafford v. Stearns.]

the entire crop raised the present year on Dr. Stearns's place near Fort Deposit, Alabama; to have and to hold the same, unto the said J. D. Gafford, his heirs, and assigns, forever, in fee; with the express condition, however, that is to say: that whereas *we* have this day executed to him, J. D. Gafford, a note for the payment of one hundred dollars, for and in consideration of said advances as aforesaid to make a crop the present year, now, if said note, bearing even date herewith, shall be paid off and discharged at maturity, by a payment of said money in accordance with the terms of said note, then this mortgage deed to be null and void; but, if said note is not fully paid and discharged, at or before maturity, with all interest which may have accrued thereon, then the said J. D. Gafford, his heirs, or assigns, shall have the power, and *we* hereby authorize him, or his agent, to take, and, after giving ten days' notice, by advertisement at the court-house in the town of Greenville, Alabama, to sell said property to the highest bidder for cash, before the court-house door in said county, and apply the proceeds to the payment of said note (?) 1st day of October, adding all costs of collecting and recording; and the overplus, if any should remain, pay over to the undersigned. And *we* hereby relinquish all right of redemption of said property. *We* certify that the above property is unincumbered. Given under *my* hand and seal, this 2d day of May, 1870.

"JAMES H. TURNER."

This instrument, which was partly printed and partly written, was not attested by any subscribing witnesses, nor was it ever recorded; but it was acknowledged by the grantor, before a justice of the peace, on the 14th November, 1870; and on the back of it was a promissory note, which, except the names, dates, and amounts, was also printed, as follows: —

"Greenville, May 2, 1870. On or before the first day of October next, 1870, I promise to pay to the order of J. D. Gafford, at Greenville, Alabama, one hundred dollars, in consideration of necessary provisions to the amount of the value of said money, this day advanced by said J. D. Gafford to *us*, *bonâ fide* received for the purpose of making a crop the present year; and without such advances it would not be in our power to procure the necessary teams, provisions, and farming implements to make a crop on *our* farm in Lowndes county, Alabama. And it is hereby agreed and understood, that this note is made to secure a lien on the stock, as also the whole crop raised by us the present year, on said farm or elsewhere, by virtue of the act of the general assembly, approved January 15, 1866; hereby waiving all exemptions for the use of families by the laws of the State of Alabama.

"JAS. H. TURNER."

[Gafford v. Stearns.]

" The plaintiff then testified, as a witness for himself, in rebuttal, that he made no such contract as was testified to by defendant and said James H. Turner, and that he had no such conversation as was testified to by said Turner, and that the defendant gave him no notice of his mortgage ; and he read in evidence the following letter from defendant." This letter is not set out in the bill of exceptions.

" This being, in substance, all the testimony in the cause, the court charged the jury, among other things : 1st, that if the plaintiff was to have the cotton, or it was to be his until he was paid for the supplies furnished, and if it was actually delivered to him by Turner and Harbinson, then he had a lien on the cotton, and he had such a title as would authorize him to recover in this action ; 2d, that the instrument read in evidence by the defendant, purporting to be a mortgage, was a crop lien, and should have been recorded in sixty days ; and that if the jury believe it was not recorded in sixty days, then it was of no validity."

The defendant excepted to each of these charges, and requested the court, in writing, to instruct the jury : —

" 1. That a verbal agreement with Turner, in March, 1870, that the plaintiff should have a lien on the crop for the supplies he might furnish to Turner during the year, is ineffectual as to the defendant in this case.

" 3. That the instrument executed by said Turner, dated the 2d May, 1870, and read in evidence by the defendant, is a mortgage, and not merely a crop lien note ; and that if the jury believe, from the evidence, that said instrument was executed by said Turner, and that the plaintiff had notice of its execution before the time when, as he claims, the cotton was delivered to him by said Turner, then the plaintiff did not thereby acquire such title to said cotton as to maintain this action for it.

" 4. That unless the jury believed, from the evidence, that at the time the defendant got possession of the bale of cotton now in suit, there had been an ascertainment of the amount of the crop raised on plaintiff's land by Turner and the other tenants, and divided, agreed to, and delivered to the respective tenants interested in said crop, then the plaintiff and his tenants were tenants in common as to this cotton, and the plaintiff could not maintain this action for it in his own right alone.

" 5. If the jury find, from the evidence, that the contract proved in this case was made in December, 1869, and was not in writing, and was not to be performed within one year from the making thereof, it is void, and the plaintiff cannot recover on any right growing out of it.

" 6. The plaintiff, before he can recover in this case, must satisfy the jury that there was a parting with all right, title, and interest in the bale of cotton sued for, by all the tenants in common to him, and also a delivery of the cotton by them to him, and this delivery must be by and with the consent of each one of the tenants in interest."

The court refused each of these charges, and the defendant excepted to their refusal; and he now assigns as error the charges given, and the refusal of the charges asked.

GAMBLE & POWELL, for appellant.

HERBERT & BUELL, *contra*.

BRICKELL, J. — The general rule is, that to maintain detinue, the plaintiff must, at the commencement of the action, have a general or special property in the goods sought to be recovered. 1 Chitty's Pl. 121. Possession alone will entitle him to recover against a mere wrong-doer, not showing any right of property in himself. *Dozier* v. *Joyce*, 8 Porter, 303; *Stoker* v. *Yerby*, 11 Ala. 332; *Miller* v. *Jones*, 26 Ala. 247. Possession, and the right of possession, accompanied by a lien for the payment of money advanced, or a debt previously contracted, entitles the plaintiff to maintain the action against any one disturbing his possession. *Bryan* v. *Smith*, 22 Ala. 534; *Desha* v. *Pope & Son*, 6 Ala. 690. Tested by these principles, there was no error in the charge of the court, that if the plaintiff was to have the possession of the cotton, until he was paid for supplies furnished the persons by whom it was raised, and it had actually been delivered to him, he had such title as would support the action.

2. The instrument under which appellant deduced title to the cotton in controversy, as transcribed in the bill of exceptions, consists of two parts. The first of these is a mortgage. By apt words, it transfers title to the things on which it is to operate; its consideration is the security of a debt owing by the mortgagor to the mortgagee; it is subject to the condition, that it is to be void on the payment of this debt; it contains a power to the mortgagee of making sale of the things conveyed, if default is made by the mortgagor in the payment of the debt. Thus, it has every essential and characteristic of a mortgage. The second part is a promissory note of the mortgagor, expressing the consideration, and declaring the facts necessary to the creation of a statutory lien, under the statute attaching liens to debts contracted for advances to make crops. R. C. §§ 1858–60. This statutory lien is "lost and forfeited," in the words of the statute, by a failure to record this note within

[Gafford v. Stearns.]

sixty days. A failure to record the mortgage renders it inoperative, only against creditors and purchasers without notice ; as to all other persons, it is valid and operative. It is not an objection to the operation of the instrument as a mortgage, that, as to the growing crop, it could have been made available, either as a mortgage, or as a statutory lien. It is not of uncommon occurrence, that contracts may operate in different modes, or that deeds may enure in different ways. When the contract or deed is so made, the promisee, or grantee, generally has an election as to the way in which he will take it. We are not sure, and do not wish to be understood as intimating an opinion, that under the evidence the instrument could have operated a statutory lien, A comparison of the evidence most favorable to the appellant, with the statute, presents difficulties in giving it such an operation, on which it is not necessary for us now to pass. We decide only, that if the instrument is capable of operating a statutory lien, it is also capable of operating as a mortgage, and that the circuit court erred in charging the jury, that it is not a mortgage, but a *crop lien only*.

3. A verbal agreement between landlord and tenant, or between tenants in common of a growing crop, that the landlord, or a co-tenant, shall have a lien on the crop, for supplies furnished the tenant, or a co-tenant, is valid, and operative against all persons but *bonâ fide* purchasers without notice. Such an agreement is not offensive to any provision of our statute of frauds. *Morrow* v. *Turnley*, 35 Ala. 131. There was, therefore, no error in refusing the first charge requested by the appellant.

4. The appellant does not stand in the position of a *bonâ fide* purchaser. He is a mortgagee, and the consideration of his mortgage is the security of an antecedent debt of the mortgagor. Such a mortgagee is affected by all the equities which would prevail against the mortgagor. Whatever infirmity, or incumbrance of title, exists against the mortgagor, exists against the mortgagee. *Wells* v. *Morrow*, 38 Ala. 125 ; Story on Sales, § 313.

5. When a verbal agreement for a lien on goods or chattels is made, notice of a mortgage or other charge, made subsequently to the creation of the lien, cannot affect the right of the lien holder to take possession, when under the terms of the agreement he becomes entitled thereto. If, in pursuance of the agreement creating the lien, he obtains possession, he has a right to detain, until the lien is satisfied. If his possession is disturbed, he may maintain detinue against any one into whose possession the goods or chattels pass. The third charge requested by the appellant was, therefore, properly refused.

6. The fourth charge requested by appellant was, also, properly refused. It proceeds on the supposition, that tenants in common of a growing crop cannot make a partial severance or division, so as to vest title in each tenant to the share allotted him. They may make such division or severance, as the crop is gathered; and as the division is made, each one holds in severalty the share allotted him, while they remain tenants in common of the part of the crop not divided.

7. The sixth charge was properly refused. It is certainly true, as a general rule, that to maintain detinue, the plaintiff must have the entire legal title to the chattels sued for. But possession will entitle him to maintain the action, against one who does not show a better right to the possession. An outstanding title in a stranger cannot be set up by the defendant to defeat the plaintiff's right to have the chattels restored to his possession, unless he connects himself with that title. *Sims v. Boynton*, 32 Ala. 353. There was evidence tending to show that the bale of cotton was in the possession of the plaintiff when it was taken by the defendant, and that it was delivered to him on a partial division of the cotton, had with Turner and Harbinson, two of the tenants. The only right or title to the cotton asserted by the defendant was derived from Turner. If Pearman, the other tenant, has any interest in, or right to the cotton, the defendant shows no connection with this right, and cannot set it up to defeat the plaintiff's recovery on his possession.

8. The charge requested, that if the agreement between the plaintiff and Pearman and Harbinson was made in December, 1869, and was not to be performed within one year from the making thereof, it was void, and the plaintiff could not recover on any right growing out of it, was properly refused. If the cotton in controversy was delivered to the plaintiff in part performance of the contract, as there was evidence tending to prove, the plaintiff was entitled to recover, though the contract was verbal, and not to be performed in one year. The statute of frauds avoids executory, not executed contracts. Independent of this consideration, it is not for a mere stranger to a contract, as is the defendant to the contract between plaintiff and his tenants, to question its validity, because it is offensive to the statute of frauds. The parties may elect to treat it as valid, and to perform it. If they should, others cannot avail themselves of an objection to the contract, which they have waived.

For the error in the second charge given by the court, the judgment is reversed, and the cause remanded.