[Civ. No. 7232. First Appellate District, Division One.—November 10, 1930.]

McCAFFEY CANNING COMPANY, INC. (a Corporation), Appellant, v. BANK OF AMERICA et al., Respondents.

416

Meserve, Mumper, Hughes & Robertson and Baldwin Robertson for Appellant.

James C. Hollingsworth and Frank M. Bering for Respondents.

JOHNSON, J., *pro tem.*—This action, begun in Los Angeles County and afterward transferred for trial to Ventura County, sounds in conversion. A jury was impaneled for the trial of the case, but, the court having granted a motion for a nonsuit, the plaintiff appealed from the judgment thereupon entered in favor of all the defendants.

According to the record, the motion purports to have been made only on behalf of the defendants Bank of America and Lawrence Warehouse Company. Upon the appeal, however, the parties have dealt with the case as if the other defendants had joined in the motion, and, accordingly, we do likewise.

Our previous decision of the appeal was vacated and a re-argument had in order to give consideration to certain matters which were not discussed in the original briefs;

but were first pressed upon the attention of the court in the petitions for rehearing. In fact, one of the legal points now stressed by plaintiff was not raised at all until presented in a supplemental brief filed by plaintiff after the re-argument. To that brief and the new point there urged the defendants have made no reply.

This action is a sequel to an action brought by the same plaintiff in Los Angeles County against William F. Gasman, in which judgment for $10,240 went in favor of plaintiff on May 2, 1924. In that action plaintiff had caused a writ of attachment to issue on August 20, 1923, to the sheriff of Ventura County. The writ was accompanied by instructions to the sheriff to attach all canned goods, cans, cases, and other materials of the debtor in the canning plant located at Camarillo, in Ventura County, operated under the name of Ventura County Canning Company, which was a co-partnership composed of Gasman and two others, William Heck and W. A. Clarke. According to the return of the sheriff, he levied upon 12,000 cases of canned apricots and all other personal property of said Gasman by taking such property into his custody and placing a keeper in charge. Of the 12,000 cases of apricots, 4000 are described in the return as No. 10 cans and 8,000 as No. 2½ cans. Thereupon, the Bank of America, through its vice-president, made a third-party claim to 7,773 cases of No. 2½ cans and 3,958 cases of No. 10 cans, or a total of 11,731 cases, which were then in the custody of the sheriff under the writ, and valued in the claim at $40,000.

In its claim the bank averred that it had made certain loans to the Ventura County Canning Company on the security of the property described, and that such property was held by the bank in pledge by virtue of warehouse receipts issued by the Lawrence Warehouse Company in favor of the bank, and delivered into the bank's possession before the attachment. The Lawrence Warehouse Company is a corporation with its office and principal place of business in Los Angeles; and the contention of the defendants is that this company was warehousing the canned apricots in the premises in which the canning operations were being conducted by the Ventura County Canning Company.

Upon receipt of the bank's claim the sheriff duly notified the plaintiff. After some hesitation the plaintiff refused to

furnish an indemnity bond to the sheriff, upon the ground that the claim was legally insufficient and that there had not been the change of possession required by law for consummation of a pledge. Left without the protection of an indemnity bond, the sheriff withdrew his keeper, thus releasing from his custody not only the 11,731 cases claimed by the bank but also whatever else had been seized under the writ. The apricots included in the claim of the bank and so released from attachment were ultimately delivered by the warehouse company to the bank and sold by the bank for its own account, the entire proceeds being applied toward satisfaction of its loans.

The judgment obtained later by plaintiff against Gasman remaining wholly unsatisfied, plaintiff began this action on December 8, 1924, against the bank, the warehouse company, the sheriff, and the surety on the sheriff's official bond, to recover damages for conversion.

So far as the sheriff and his surety are concerned, the chief point presented by plaintiff relates to the sufficiency of the third-party claim. It was made on behalf of the bank by the vice-president in the form of an affidavit, to which the affiant took oath before a notary public. Plaintiff contends that an oath so taken by a claimant, without addition of the phraseology used in verifying a pleading, is not a "claim verified by his oath" within the meaning of section 689. of the Code of Civil Procedure. Such a claim, however, is not a pleading, and may frequently have to be drawn by persons unfamiliar with legal jargon. The affidavit criticised conforms to the usual practice, and in such matters technical niceties should not overshadow the rights of a claimant to legal possession. One of the definitions of the word "verify" in the Standard Dictionary is "to affirm under oath", and in The New English Dictionary one of the meanings given is "to testify or affirm formally or upon oath". In our opinion an affidavit setting out the facts and sworn to before an authorized officer meets fully the demands of the law, and puts the attaching creditor to his election either to protect the sheriff with a sufficient indemnity bond or to submit to release by the sheriff of the property claimed.

The plaintiff argues that the sheriff's liability is governed by the decision in *Arena* v. *Bank of Italy*, 194 Cal. 195 [228

Pac. 441]. In that case, however, there was first filed a claim clearly insufficient on its face, and hence, under the law as it read at the time, the claim furnished no basis for the demand for indemnity made by the sheriff. An amended claim was then filed, and, upon the strength of the amended claim, the sheriff, without any further demand, released the attached property. Such release, without notice to the attaching creditor or renewal of the demand for indemnification, was held to be contrary to law. The case has no similarity to the case before us.

In this instance the contents of the claim were sufficient to state an apparent right in the bank, as a pledgee, to possession of 11,731 cases, and the sheriff was not required to assume a judicial pose and determine, at his peril, whether or not the circumstances connected with the issuance of the warehouse receipts and their delivery to the bank satisfied the provisions of section 3440 of the Civil Code. Where a litigant's courage oozes under the pressure of a demand for indemnification against a third-party claim sufficient on its face, the law will not make the sheriff the scapegoat. (*Taylor* v. *Bernheim,* 58 Cal. App. 404, 408 [209 Pac. 55].)

So far, then, as concerns the 11,731 cases claimed by the bank, the sheriff is not chargeable with conversion. But his return shows seizure and custody of a total of 12,000 cases of apricots and all other personal property of the debtor found in the premises. Under section 4159 of the Political Code the sheriff's return is *prima facie* evidence of the facts therein stated; and, in addition, the record contains affirmative testimony of the under-sheriff and of William Heck, one of Gasman's partners, that, besides the apricots claimed, there was a small lot of canned goods and some other things stored in the warehouse. Such additional property, which was apparently released by withdrawal of the keeper, was clearly of minor value; and in the briefs originally filed by plaintiff no charge on this score was made against the sheriff or his surety. In plaintiff's petition for rehearing, however, the contention was made that the sheriff had released, to plaintiff's prejudice, property not included in the bank's claim, and that as to such property, at any rate, plaintiff was entitled to have the case submitted to the jury. The plaintiff is technically within its rights in

this contention, and we must hold that, upon the evidence as it stood at the time of the motion, neither the sheriff nor his surety was entitled to a judgment of nonsuit.

The really vital questions in the case, between the plaintiff on the one hand and the bank and the warehouse company on the other, are whether, as to the property claimed by the bank, there had been a change of possession sufficient to protect the bank as a pledgee; and, if not, whether dominion and control achieved by interjection of a wrongful third-party claim, and the resulting defeat of the attachment lien, amounted to a conversion of the property so taken from the custody of the sheriff.

This latter question was not raised in the trial court on the motion for a nonsuit, that motion having been predicated and granted solely upon the asserted ground that the evidence conclusively showed, as a matter of law, that there had been an actual delivery of possession by the Ventura Canning Company to the Lawrence Warehouse Company, which had issued its warehouse receipts to the Bank of America and was at the time of the attachment maintaining possession on behalf of the bank. The defendants insist that the warehouse company was using the premises of the Ventura Canning Company as a so-called "field warehouse", and had acquired, as a warehouseman, sufficient legal possession for the issuance of effective warehouse receipts.

In determining the propriety of the judgment of nonsuit in favor of the bank and the warehouse company, the question whether liability for conversion may follow procurement of possession by the interposition of an unsustainable third-party claim may more conveniently be considered before adverting to the subject of "field warehousing".

The bank in its petition for rehearing contended that plaintiff's failure to maintain the attachment by giving the sheriff an indemnity bond worked a forfeiture of the attachment lien, leaving the property claimed as fully subject to the control and disposition of the claimant as if the sheriff had never made seizure, and that as a result no action for conversion could lie in favor of the plaintiff.

Such result undoubtedly follows when an attachment is intercepted by a claim sufficient in form which is also lawfully grounded. But plaintiff in its brief, filed after the re-argument, urged for the first time that the frustration of

an attachment lien by assertion of a claim wrongful in fact must necessarily find its remedy in an action for conversion. This contention, made late it is true, has not been answered by the defendants, and on neither side do the briefs contain any citations directly on the point. We have been left, therefore, to our own independent study and research.

Section 689 of the Code of Civil Procedure authorizes the sheriff to release attached property claimed by a third person, unless the attaching creditor gives the sheriff an indemnifying bond in double the value of the property. This provision, as we conceive, is for the protection of the sheriff, and is not designed to give immunity to a third person who defeats the attachment by assertion of a specious or invalid claim.

It is true that the attaching creditor may preserve his lien by indemnifying the sheriff, but that may not always be a practicable remedy. In this instance the value placed on the property claimed was $40,000; and the plaintiff had to elect between furnishing a bond of $80,000 or submitting to relinquishment of custody by the sheriff. One might well pause under such circumstances, and it may not be said that the failure of an attaching creditor to furnish indemnity absolves a hostile claimant of all liability for wrongful appropriation. (*Smith* v. *Kaufman,* 94 Ala. 364, 367 [10 South. 229].)

The lien acquired by an attachment is a vested interest affording specific security for satisfaction of the debt put in suit. If this security is made worthless by unlawful procurement of the property under an invalid third-party claim, there is no undertaking to which the attaching creditor may have recourse. Hence, without immediate opportunity for a judicial probe of the claimant's title, the creditor must go remediless, unless the law reserves to him a right of action for damages for tortious intermeddling with his attachment lien. In this connection it is to be noted that at the time in question the statute did not provide, as it now does, for an immediate judicial hearing, on petition of the attaching creditor, to determine the title of the claimant.

While the property was in the custody of the sheriff, it was constructively in the possession of plaintiff

through the sheriff as his agent. (*Taylor* v. *Bernheim,* 58 Cal. App. 404, 408 [209 Pac. 55].) And one who has a lien on property, though not in actual physical possession of it, may maintain an action for damages against any person whose acts diminish the value of the security or render it ineffectual. (*Hansbrough* v. *D. W. Standrod & Co.,* 49 Idaho, 216 [286 Pac. 923] ; 11 C. J. 9, sec. 19.)

 While an action for conversion requires evidence of a tortious exercise of dominion, the defiance of the injured party's rights need not be wilful or corrupt. (24 Cal. Jur. 1023.) It is the substantial injury inflicted which constitutes the gravamen of the action.

 Any wrongful assumption of authority over chattels, inconsistent with another's right of possession or subversive of his vested interest therein, amounts to conversion. Thus, in *Cobb* v. *Dows,* 9 Barb. (N. Y.) 230, 242, quoted by our Supreme Court in *Dodge* v. *Meyer,* 61 Cal. 405, 421, it is said: "The proof need not show a tortious taking, or that the defendants acted in bad faith. If it should appear that they obtained the goods fairly from a person whom they had reason to think was the true owner, or if they acted under a mistake as to the plaintiffs' title, or under an honest but mistaken belief that the property was their own, they would still be liable to plaintiffs if their acts in regard to it amount to a conversion. If they have taken it into their own hands or disposed of it to others, or exercised any dominion over it whatsoever, they are guilty of a conversion and their liability to plaintiffs is established."

 An unjustified claim of title may amount to conversion (*Kilmer* v. *Hutton,* 131 App. Div. 625 [116 N. Y. Supp. 127, 136] ; and though the claimant may act in good faith or under mistake, yet he is not exonerated from liability where the law charges him with the duty to know before he intrudes. (*First Nat. Bank* v. *Morgan,* 213 Ala. 125, 128 [104 South. 403] ; *United States Zinc Co.* v. *Colburn,* 124 Okl. 249, 250 [255 Pac. 688].)

 The special interest which an attaching creditor has in property held in the custody of the sheriff as his agent is a sufficient foundation for an action for conversion. (*Carvell* v. *Weaver,* 54 Cal. App. 734, 737 [202 Pac. 897].) And an affirmative act in defiance of the attachment lien, done without legal excuse and leading to relinquishment of

the property by the sheriff, does constitute conversion. In *Gafford* v. *Stearns,* 51 Ala. 434, 442, the court said: "Possession, and the right of possession, accompanied by a lien for the payment of money advanced, or a debt previously contracted, entitles the plaintiff to maintain the action against anyone disturbing his possession." In consonance with this principle, a purchaser of grain, in *Hahn* v. *Sleepy Eye Milling Co.,* 21 S. D. 324 [112 N. W. 843], was held liable in conversion to a thresher possessed of a paramount statutory lien. In like manner, in *Kennard* v. *Harvey,* 80 Ind. 37, the purchase and removal of a tenant's crop, with notice of a landlord's statutory lien, was declared to amount to conversion. So, also, in *Hugo State Bank* v. *Hugo Nat. Bank,* 96 Okl. 135 [220 Pac. 868], appropriation by the defendant of crops on which a lien had been created by contract was treated as a conversion. A somewhat similar case arose in *Rew* v. *Maynes,* 147 Iowa, 15 [125 N. W. 804]. In that case, while the judgment went against the landlord because he predicated his right of recovery on ownership of the crop instead of on impairment of his lien, the court took occasion to mark the distinction. "If," it said, "plaintiff had predicated his right to recover on his contract lien, and demanded from defendant possession of the corn on the ground that the security of his lien was impaired to the extent to which the corn was taken from the premises by defendant, he would have had a right of action for conversion." Again, in *Mogul Producing & Refining Co.* v. *S. Engine & Pump Co.,* (Tex. Civ. App.) 244 S. W. 212, a materialman who had a lien for removable pumps installed in a refinery, recovered damages for conversion from a purchaser of the property who refused to surrender the pumps. In analogy with the cases cited reference may be made to *Interstate Nat. Bank* v. *McCormick,* 67 Mont. 80 [34 A. L. R. 721, 214 Pac. 949]. There, goods shipped by rail to a buyer were detained in the custody of the carrier by an injunction procured by the buyer in an action against the seller, and were so held for eighteen days, until demurrage charges exceeded the value. The draft for the purchase price, to which the bill of lading was annexed, was payable to the bank, which, not being a party to the injunction suit, could have no recourse to the injunction bond. Accordingly, since the injunction interfered un-

lawfully with the bank's right of control and disposition of the goods, the bank was adjudged entitled to recover damages from the buyer in an action for conversion.

In accord with the views expressed in the cases cited, we have the declaration of our own Supreme Court in denying the petition for rehearing in *Arena* v. *Bank of Italy,* 194 Cal. 195, 211 [228 Pac. 441, 448]. Speaking there of release of attached property on a third-party claim insufficient in law, the court said: "This being so, and said bank having been a coactor with its codefendant, the sheriff, in procuring an unlawful release of the property in question from the lien of said attachment and the delivery thereof to itself, it must be held liable for whatever damages the plaintiff sustained from the conversion of said property accomplished thereby." In the Arena case the claim presented was insufficient on its face; but, as to a claimant, we perceive no difference in principle, whether the destruction of the attachment lien is accomplished by a claim insufficient on its face or by a claim which, though valid on its face, is invalid in fact. In either case the injury inflicted is the same.

Accordingly, we reach the conclusion here that unless the Bank of America was in fact legally justified in claiming as a pledgee, the plaintiff should be entitled to recover in conversion for the nullification of its attachment lien.

We are thus brought back to the inquiry whether it may be said that, as a matter of law, plaintiff's evidence conclusively established the existence of a valid pledge to the bank.

In considering this question it will be necessary to have in mind the circumstances surrounding the dealings between the parties. The canning business of the Ventura County Canning Company was carried on in a workshop or factory at Camarillo, rented from the California Fruit Confection Company, which conducted its business on the other side of a wooden partition in the same building. The rent payable by the canning company was 12½ cents per case, and its output for the canning season was about 50,000 cases. A man named Pace, employed by the canning company, served as its cookroom foreman and superintended the canning operations, at a salary of $60 per week.

With the consent of its landlord the canning company, on June 28, 1923, sublet its entire shop, on a month to month tenancy, to the Lawrence Warehouse Company, at a rent of $1 per month, for warehouse purposes. This lease was recorded July 28, 1923.

Notwithstanding this sublease the canning company continued to conduct its business in the shop as before, using during the apricot season 150 to 200 employees. Pace continued to act as cookroom foreman; and at the same time he acted also as the sole representative of the Lawrence Warehouse Company on the premises. In fact, he drew his salary of $60 a week from the warehouse company and that company then rendered a bill for the amount to the canning company. Practically all Pace's time was given to superintendence of the canning processes. At night an employee of the canning company slept on a cot in a cubbyhole above a small office partitioned off from the shop, and during the night the premises with its contents were in his care.

When the cans had been filled and were ready for stacking, they were moved on trucks to another part of the shop and stacked by skilled employees of the canning company, in rows set about four and a half feet apart, and reaching to the ceiling. At the time of the attachment there were three or four such stacks in place. Frames made of slats were placed around the several stacks for the purpose of separating them and simplifying the count. The canning was done at the north end of the shop and the storage at the south end. There was nothing to separate the canning department from the storage department except an intervening space about 15 feet in width.

As the cases were stacked, they were inventoried by Pace who kept the records. He then issued non-negotiable warehouse receipts for the Lawrence Warehouse Company. The form used was an acknowledgment of receipt for storage "for account of, and to be delivered upon written order, without surrender of this receipt, to Bank of America, Los Angeles".

Referring to these receipts, Heck, one of the partners interested in the cannery, said in his testimony: "We jumped in the car, as soon as we got them, and went to Los Angeles,

and to the Bank of America, and got all the money we could.''

As receipts were issued, stack cards of the Lawrence Warehouse Company were placed on the stacks, about six feet from the floor, each specifying the aisle, stack and mark, and giving the date, lot number and quantity. These cards bore, also, the statement, ''Warehoused to Bank of America.''

When fruit was to be marketed, a release was issued from the Los Angeles office of the Lawrence Warehouse Company on order of the Bank of America; and, upon delivery of the release to Pace, withdrawal of the quantity designated followed. The cans were then labeled, packed in cases, and shipped by the canning company to fill orders obtained through brokers, who appear to have assumed responsibility to the bank for the proceeds of sale.

The canning company really paid Pace's salary; and though the warehouse company, according to the sublease, was charged the nominal rent of $1 per month, there was an accompanying agreement obligating the canning company to pay the warehouse company for issuing receipts three cents per case for the first 50,000 cases and lesser amounts for additional quantities.

No sign of the Ventura County Canning Company seems to have been displayed on the building. There was a sign of the California Fruit Confection Company on the outside, and a sign of the Lawrence Warehouse Company inside the shop near the south end. While Mr. Heck said the warehouse company had two of its signs on the outside, his co-partner, Mr. Clarke, said there was none on the outside to his knowledge. For purposes of nonsuit the testimony of Heck on this point must be disregarded.

The question now before us is whether, under the circumstances recited, there was error in granting the motions of the bank and the warehouse company for a nonsuit instead of letting the case go to the jury as to them.

When there is actual delivery of merchandise to a warehouseman, with actual and explicit change of possession, and a warehouse receipt is issued and delivered to one lending money on the security of the merchandise in store, the delivery of the warehouse receipt is the legal equivalent of the delivery of the merchandise itself; but such symbolic

possession by the pledgee is dependent for its efficacy upon complete and actual, as distinguished from merely formal or colorable, relinquishment of possession and control by the pledgor.

If, under the facts of this case, there was a transfer of possession from the canning company to the warehouse company of such exclusive character that it must be declared, as a matter of law, that there was indisputable compliance with the requirements of section 3440 of the Civil Code, then the judgment of nonsuit was properly entered; but if a contrary conclusion was reasonably deducible from the evidence, the case should have been allowed to go to the jury as the triers of the facts.

It is contended by the defendants that the warehouse company used the premises as a so-called "field warehouse", and cases from other jurisdictions are cited in support of such a system and as authority for the order of nonsuit.

*Union Trust Co.* v. *Wilson,* 198 U. S. 530 [49 L. Ed. 1154, 25 Sup. Ct. Rep. 766], certifies answers to certain questions propounded by the Circuit Court of Appeals in a case arising in Illinois. A leather dealer named Flanders walled off a part of his basement and let it at a nominal rent to the Security Warehouse Company. The compartment had doors fastened with padlocks bearing the name of the company, and the warehouse company had the only keys. It had also a key to the building, so as to have access both day and night. There were two signs on the outside, stating in large letters that the premises were occupied by the company as a public warehouseman. The company received leather from Flanders, stored it in the locked compartment and issued warehouse receipts, which were indorsed by Flanders to the Union Trust Company as security for loans. Flanders became bankrupt and the trustee for creditors filed a bill, claiming the leather in storage. The court said that no question under the statutes of Illinois was suggested, and that since the warehouse company had the leather under lock and key in a place not visible to Flanders' patrons, to which the company had legal title and right of free access, and since there was no reason to doubt the good faith of the transaction, there was a sufficient delivery to validate the pledge. In so ruling the court is careful, however, to say (p. 537): "We deal with the case be-

fore us only. No doubt there are other cases in which the exclusive power of the so-called bailee gradually tapers away until we reach those in which the courts have held as matter of law that there was no adequate bailment."

*Manufacturers' & Traders' Bank* v. *Gilman*, 7 Fed. (2d) 94, is a similar case. There engines and engine parts were kept in a locked room for the bank as a pledgee. There was a written indenture of trust, whereby the general manager of the pledgor was named as trustee for the bank. He had the key to the room, which was rented to the bank, and the stored material was tagged so as to state that it was "Property of N. B. Gladwin, Trustee". In a proceeding instituted by the receiver in bankruptcy against the bank it was held that there was a valid pledge.

*Sexton* v. *Kessler & Co.*, 225 U. S. 90 [56 L. Ed. 995, 32 Sup. Ct. Rep. 657], is a case brought by a trustee in bankruptcy to set aside a certain alleged illegal preference in the transfer of securities. The New York house of Kessler & Co. was indebted to the English house of the same name, and, for the protection of that creditor, set apart certain ear-marked securities, which were kept on a separate shelf in the firm's vault and listed in a document transmitted to the English house. In the panic of 1907 the New York house became embarrassed and filed a petition in bankruptcy. Before doing so, however, it delivered the ear-marked securities to an agent of the English house then in New York. It was held that the English house had an equitable lien superior to the rights of the trustees. This case can hardly be said to have a bearing on the case before us, especially since such securities are not in the same class with goods and chattels.

The remaining cases cited by defendants were either heard upon appeal after a decision in the trial court upon the facts, or were decisions rendered by the trial judge after taking the evidence himself, or upon a hearing after reference to a master to take testimony and report his conclusions. Thus, in *Dunn* v. *Train*, 125 Fed. 221, 222, the court said: "It being a question of intention, and a question whether the change in the situation of the property was such as to be notice of a change of possession, it was, under the circumstances, largely a question of fact, to be determined under rules of law." And the findings of the trial

judge in favor of the pledgee were sustained. A similar situation existed in *Love* v. *Export Storage Co.*, 143 Fed. 1.

*Bush* v. *Export Storage Co.*, 136 Fed. 918, and *Evans* v. *New York S. S. Co.*, 163 Fed. 405, were decisions by the trial judge after submission of the cause upon the evidence taken before him. Again, *Philadelphia Warehouse Co.* v. *Winchester*, 156 Fed. 600, and *American Can Co.* v. *Erie Preserving Co.*, 171 Fed. 548, were decisions confirming the master's report. *Israel* v. *Woodruff*, 299 Fed. 454, falls into the same category, being an appeal from a decree confirming the report of the master. The appellate court there said (p. 456): "The experienced trial judge having approved the master's report, it will be permitted to stand, unless an obvious error has intervened in the application of the law, or some serious or important mistake appears to have been made in the consideration of the evidence." *National Union Bank* v. *Shearer*, 225 Pa. St. 470 [17 Ann. Cas. 664, 74 Atl. 351], and *State* v. *Robb-Lawrence Co.*, 17 N. D. 257 [16 L. R. A. (N. S.) 227, 115 N. W. 846], have but a remote application to the present case; but each came up for review of a judgment entered upon the verdict of a jury, and the judgment was affirmed.

While in *American Can Co.* v. *Erie Preserving Co.*, reported in 171 Fed. at page 548, the trial judge approved the master's report to the effect that the goods pledged were conspicuously marked and set apart in a way to give the pledgee exclusive dominion, yet in a companion case, bearing the same title and reported in the same volume at page 540, the same judge, dealing with other goods, found that there was only a semblance of an attempt to warehouse those goods in the premises of the pledgor. Accordingly in that case he held that there was no such change of possession as to validate the receipts in the hands of the pledgee. The judgments in both these cases were affirmed on appeal in *American Can Co.* v. *Erie Preserving Co.*, 183 Fed. 96, the court, as to the case reported in 171 Fed. 540, saying (p. 98): "Warehouse receipts would give constructive possession of goods actually warehoused; but it is plain that the warehousing company did not maintain a warehouse in any proper sense, because it had no exclusive and unequivocal possession."

In *MacDonald* v. *Aetna Indemnity Co.*, 90 Conn. 415 [97 Atl. 332], cited also by defendants, one Rodebaugh, a grain dealer at Buffalo, entered into a written contract with the American Warehousing Company, whereby he leased to the warehouse company as a "field storage warehouse" the property on which his grain business was conducted. The plot of ground was marked at the corners by stakes bearing the initials of the warehouse company; and one of Rodebaugh's employees acted as custodian for the warehouse company. Warehouse receipts were issued to the Bank of Buffalo as collateral security for loans to Rodebaugh. The bank was further protected by bonds given by the Aetna Indemnity Company to indemnify against any loss "through the negligence or dishonesty" of the warehouse company or its custodian. After the lease to the warehouse company, and before the issuance of receipts to the bank, Rodebaugh transferred his business to the Niagara Company, of which he became president; and upon Rodebaugh's death, a few months later, the Niagara Company filed a petition in bankruptcy, and a receiver was appointed, who took the grain into his possession. Immediately after Rodebaugh's death, however, the warehouse company had asserted its right to possession of the grain, and placarded the interior of the mill, the elevator, the bins and bags with conspicuous signs declaring its interest in the property, and maintained possession until ousted by the receiver. The receiver having taken and sold the grain, the bank caused suit to be brought by the insurance commissioner on the indemnity bond furnished by the warehouse company, charging negligence by that company. In the trial court the judgment sustained the claim of the Bank of Buffalo under the bond. This judgment was reversed on appeal; but the court said that up to the time of Rodebaugh's death there had been no such change of possession as to validate a pledge; that the marking of corner stakes was not adequate notice, and any possession of the custodian, who remained in the employ of the pledgor, was really the possession of his employer. The case turned on what was done by the warehouse company the day following Rodebaugh's death and two weeks before the appointment of the receiver. The court ruled that possession was then actually taken before any specific lien had been acquired by any creditor, and that

there had been no illegal preference under the bankruptcy law. In its decision the court took into consideration the statute of New York. At the time of the transactions, which occurred between January, 1906, and August, 1907, the statute had a qualification not embodied in section 3440 of our Civil Code. The statute then in force in New York declared transfers without actual change of possession fraudulent, "unless it appear on the part of the person claiming under the sale or assignment that it was made in good faith and without intent to defraud such creditors or purchasers". (4 Birdseye's Cons. Laws of N. Y., sec. 36.) Under our law good faith, without good works, supplies no saving grace.

In *Union Trust Co.* v. *Wilson,* 198 U. S. 530, 537 [49 L. Ed. 1154, 25 Sup. Ct. Rep. 766], the general principle applicable in cases of questioned change of possession was couched by Judge Holmes in this form: "When there is conscious control, the intent to exclude and the exclusion of others, with access to the place of custody as of right, there are all the elements of possession in the fullest sense." At the same time he added a word of caution about cases where the exclusive power of control "tapers away".

Such a case is exhibited in *In re Rodgers,* 125 Fed. 169. There, Rodgers, a dealer in seeds in Chicago, prior to his bankruptcy, had made certain written contracts with the National Storage Company, whereby Rodgers leased to the company part of his premises, and the storage company agreed to store his goods therein and issue its receipts therefor. The receipts were used by Rodgers as collateral security for loans. The storage company had some signs inside the building, but not conspicuously placed; and its inspector visited the premises several times a week. The keys, however, were kept by Rodgers alone, access being obtainable only through him; and he continued to conduct his business on the premises as of old. Upon each pile of bags for which receipts were issued there was placed a small tag; but Rodgers was left in a situation to deal with the seeds much as he pleased. In a controversy which arose between the trustee in bankruptcy and the holders of receipts, the court ruled upon appeal that there had never been a change of possession sufficient to validate the receipts, and consequently there existed no enforceable pledge.

In *Surety Warehousing Co.* v. *Hand,* 206 U. S. 415 [11 Ann. Cas. 789, 51 L. Ed. 1117, 27 Sup. Ct. Rep. 728], affirming the decree of the Circuit Court of Appeals upon the facts recited in 143 Fed. 32, the court said in reference to certain warehouse receipts issued to the Racine Knitting Company and transferred to pledgees (p. 421): "The general law of pledge requires possession, and it cannot exist without it. *Casey* v. *Cavaroc,* 96 U. S. 467 [24 L. Ed. 779]. There was scarcely a semblance of an attempt at such change of possession from the hands of the knitting company to the hands of the warehousing company. Actual possession of the property in question was exercised by and existed with the knitting company substantially the same after the issuing of the receipts as before. It is trifling with words to call the various transactions between the knitting company and the warehousing company a transfer of possession from the former to the latter. There was really no delivery, and no change of possession, continuous or otherwise. The alleged change was a mere pretense, a sham."

In that case the Racine Knitting Company had leased to the warehouse company certain portions of the knitting company's premises both at Racine and at Stevens Point, Wisconsin. Employees of the knitting company, nominated by the warehouse company, acted as custodians for the latter. The stored goods were kept within slatted inclosures or fence-like palings, and the inclosures were provided with sliding doors secured with padlocks to which the appointed custodian had keys. These, however, were kept by the custodian in such a way as to be accessible when desired by officers of the knitting company. There were some interior signs of the warehouse company, and some use was made of identification cards also. Nevertheless it was held that the facts did not show the open, exclusive, unequivocal possession required by law.

Warehousing on the premises of the owner proposing to pledge his merchandise is effective when done in obedience to legal requirements; but when done only far enough to get the goods represented by documents without really getting them stored, the documents are but scraps of paper. The term "field warehousing" is not a talisman to give

dominion by enchantment. Taking exclusiveness of possession and control as the criterion, we find now and then a case where it may be said as a matter of law that, through the field warehouse, open, exclusive and unequivocal possession passed constructively to a pledgee; and then again in other cases we find that as a matter of law the possession of the warehouseman "tapers away" to nothingness. Between these two extremes lies the aggregation of cases in which the facts are such that different men may with reason reach opposing conclusions. Cases of that character, when tried by a jury, must be allowed to go under proper instructions to the jury for their determination of the facts in controversy.

 Whether warehousing is called "field warehousing" or by any other name, it cannot be effectively conducted in this state without compliance with the law as declared in section 3440 of the Civil Code. Merely colorable or constructive change of possession accomplishes nothing in favor of a pledgee. There must be open, visible, unequivocal change of possession, manifested by such substantial outward signs as to make it evident to the world that the control of the owner has wholly ceased, and that another has acquired, and is openly exercising, the exclusive dominion over the property. (*Stevens* v. *Irwin*, 15 Cal. 503, 506 [76 Am. Dec. 500]; *Cahoon* v. *Marshall*, 25 Cal. 197, 201; *Godchaux* v. *Mulford*, 26 Cal. 316, 324 [85 Am. Dec. 178]; *Sequiera* v. *Collins*, 153 Cal. 426, 431 [95 Pac. 876]; *Hassell* v. *Bunge*, 167 Cal. 365, 366 [139 Pac. 800].)

 Actual change of possession means existing in act, and truly and absolutely carried out, as opposed to formal, potential, virtual or theoretical change. (*Bunting* v. *Saltz*, 84 Cal. 168, 170 [24 Pac. 167]; *Guthrie* v. *Carney*, 19 Cal. App. 144, 150 [124 Pac. 1045].) The proof required to show actual change of possession is not measured by any fixed set of rules. Dependence must be placed upon the facts and circumstances of each particular case; and usually the determination must rest upon the finding of the court or the jury after hearing the evidence adduced on both sides. (*Claudius* v. *Aguirre*, 89 Cal. 501, 503 [26 Pac. 1077]; *Dubois* v. *Spinks*, 114 Cal. 289, 293 [46 Pac. 95]; *Feeley* v. *Boyd*, 143 Cal. 282, 285 [65 L. R. A. 943, 76 Pac.

1029]; *Jarvis* v. *Webber*, 196 Cal. 80, 99 [236 Pac. 138];
*Bosbyshell* v. *Cline*, 51 Cal. App. 109, 113 [196 Pac. 274];
*Gray* v. *Little*, 97 Cal. App. 442, 449 [275 Pac. 870].)

The appointment of the owner, or one of his staff,
as a warehouseman's custodian of goods stored, while not
conclusively ineffectual, is nevertheless a circumstance to
give pause, and must be carefully weighed in connection
with the other facts in evidence. (*Goldstein* v. *Nunan*, 66
Cal. 524, 544 [6 Pac. 451]; *Hickey* v. *Coschina*, 133 Cal. 81,
84 [85 Pac. 313]; *Bucher* v. *Allen*, 11 Cal. App. 650, 651
[105 Pac. 942]; *Vail* v. *Nichibei Bussan Co.*, 65 Cal. App.
60, 63 [223 Pac. 577]; *Gray* v. *Little*, 97 Cal. App. 442,
449 [275 Pac. 870].)

In this case a foreign element is introduced by the inter-
jection of the warehouse company between the pledgor and
the pledgee. If the loans had been made without resort
to warehouse receipts, and the fruit had been stacked and
kept on the premises as shown in the evidence, with Pace
as custodian for the bank, there would then have been the
simple question whether the pledgee had been placed in
actual exclusive possession and control. Instead of actual
possession the bank claims to have obtained symbolic pos-
session by virtue of the warehouse receipts; but these re-
ceipts can have no virtue, unless the warehouse company
had the same actual and exclusive possession and dominion
which would have been essential to the protection of the
bank, if it had acted independently in reliance on the goods
instead of on the receipts.

*In re Spanish American Cork Products Co.*, 2 Fed. (2d)
203, the company, desiring to borrow money from a bank,
leased a portion of its premises to one of its employees;
and there, in care of the employee as agent for the bank,
was stored under lock and key the cork intended to be
pledged, the doors having a placard, reading "Property of
A. E. Nichol, Agent". The custodian had general instruc-
tions from the bank to receive payments in its behalf and
release cork; and as payments were made he supervised
removal of the quantity released. Upon the trial of an
issue between the trustee in bankruptcy of the cork com-
pany and the bank, the district court decided that the bank
had not the possession necessary to a pledge, and the de-
cree was affirmed on appeal. The court expressed its views

in the following language: "All authorities agree that possession is necessary to the validity of a pledge. The necessary indication of possession varies, of course, according to the nature and bulk and situation of the property. The rule is the pledgee must either have actual exclusive possession of the property, or if it remains on the pledgor's premises he must so separate and mark it as to give notice of his possession to the public, who might deal with the pledgor on the faith of it. In this case the cork was in the building occupied by the bankrupt, engaged in the cork business. Those who dealt with it had the right to assume in the absence of notice that the stock of cork carried in the building for use in the business was the property of the company which was using it. There was nothing on the outside to put anybody on inquiry. The public dealing with the cork company or interested in it could not be required to search for notice of some other ownership of the stock of cork by making an obtrusive and prying inspection of the inside of the cork company's premises to find and inquire the meaning of the signs of agency of one of the bankrupt's employees. There is no binding or well-considered case that goes to that length. It is the duty of the pledgee to make such segregation and marks as will indicate his possession to business men of ordinary prudence dealing with the pledgor in the ordinary course of business."

What is there said concerning a transaction directly with a pledgee applies with equal force to a transaction through the medium of a "field warehouseman".

In the discussion in which we have indulged, we are not to be understood as intimating any opinion upon the question whether the circumstances in evidence do, or do not, show a change of possession satisfying the law. As is said in *Byrnes* v. *Moore,* 93 Cal. 393, 394 [29 Pac. 70]: "Every case of the kind here involved has its own peculiar features, and must be determined on the particular facts which surround the given transaction or transfer." We hold merely that the circumstances are not such that it can be said absolutely as a matter of law that there was an actual, open, visible, and unequivocal change of possession. The plaintiff was therefore entitled to the submission of the facts to the jury for their verdict on this point under appropriate in-

structions as to the rules of law by which they should be guided.

The judgment is reversed as to all the defendants.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 10, 1930, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 8, 1931.